

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
### FORT WORTH

---

### NO. 2-07-128-CV

| | |
|---|---|
| CITY OF THE COLONY, TEXAS | APPELLANT |

V.

| | |
|---|---|
| NORTH TEXAS MUNICIPAL WATER DISTRICT AND CITY OF FRISCO, TEXAS | APPELLEES |

AND

| | |
|---|---|
| CITY OF FRISCO, TEXAS | APPELLANT |

V.

| | |
|---|---|
| CITY OF THE COLONY, TEXAS | APPELLEE |

AND

| | |
|---|---|
| NORTH TEXAS MUNICIPAL WATER DISTRICT | APPELLANT |

V.

| | |
|---|---|
| CITY OF THE COLONY, TEXAS | APPELLEE |

------------

### FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

------------

## OPINION

------------

## I. INTRODUCTION

City of The Colony, Texas, entered into a tri-party contract (the "Contract") in 1998 with City of Frisco, Texas, and North Texas Municipal Water District ("the District") for, among other things, the construction and operation of a regional wastewater system for the purpose of providing a facility to treat wastewater from both cities. The Colony made contractually required payments to the District for a number of years. But ultimately, it never delivered any of its wastewater to the District for treatment, it ceased making payments to the District, and it sued the District and Frisco for breach of contract, for a declaratory judgment that no contract was formed, and alternatively, for rescission of the Contract.

With the exception of one of The Colony's contract claims, the trial court granted the District's first amended motion for summary judgment on The Colony's causes of action. With the exception of the amount of damages and attorneys' fees to be awarded Frisco, the trial court granted Frisco's motion for summary judgment on The Colony's causes of action and on Frisco's breach of contract counterclaim. The remaining claims or outstanding issues went to trial. In addition to findings regarding attorneys' fees, a jury subsequently found that the District had materially breached the Contract for failing to have

2

adequate capacity but that the breach was excused because The Colony had previously failed to comply with a material obligation of the Contract and that The Colony owed $0.00 to Frisco for The Colony's failure to comply with the Contract. The Colony, the District, and Frisco each filed a notice of appeal.

In three issues, The Colony argues that the trial court erred by granting Frisco's motion for summary judgment and the District's motion for summary judgment and that certain subsequent trial court rulings based upon the summary judgment rulings caused the rendition of an improper judgment. In two issues, Frisco argues that the evidence is legally and factually insufficient to support the jury's findings that The Colony owed Frisco $0.00 for The Colony's failure to comply with the Contract and that Frisco was entitled to $0.00 for Frisco's appellate attorneys' fees. And in three issues, the District argues that the trial court erred by overruling its motion to disregard the jury's finding that it materially breached the Contract and that the evidence is legally and factually insufficient to support the jury's findings that the District breached the Contract and that the District was entitled to $0.00 for attorneys' fees. As to The Colony's appeal, we will affirm. As to Frisco's appeal, we will affirm in part and reverse and render in part. As to the District's appeal, we will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND AND CONTRACT EXCERPTS

3

Lanny Lambert served as The Colony's city manager from the summer of 1997 to October 2000. According to Lambert, The Colony's mayor and city council wanted to participate with the District in the creation of a regional wastewater treatment system. At the time, The Colony treated its wastewater at its Stewart Creek treatment plant, but the mayor and city council wanted to join a regional system because they felt it was the most economically feasible solution to The Colony's increasing need for treatment capacity and because the existing plant was aging, deteriorating, and had odor problems. According to Lambert, "[O]ur goal at the time was to join the regional system. We hoped to cut our costs and really to get out of the sewer treatment business, pump all of our sewer to [the District] and get out of the business." A reason for The Colony's increasing need for wastewater treatment capacity was due to the growth that the city was experiencing from the Austin Ranch and Wynnewood Peninsula developments. Lambert was thus tasked with the assignment of negotiating an agreement with the District and Frisco.[1]

---

[1] According to the contract subsequently executed by the parties, "the District [was] currently operat[ing] a wastewater treatment plant, known as the 'Stewart Creek West Plant' [the plant the subject of the Contract] . . .[,] on behalf of Frisco." This is a separate plant from The Colony's Stewart Creek Plant.

Lambert met numerous times with Carl Riehn, the District's then executive director; George Purefoy, Frisco's city manager; and a District engineer, among others, including representatives from The Colony. Through his participation in the meetings, Lambert came to the understanding that The Colony was "requesting to be allowed to participate" in the regional system but that Frisco did not "particularly care or want [The Colony] to be involved" even though it was "something [The Colony] wanted to do."[2] Lambert was told about a border dispute that had occurred earlier in history between The Colony and Frisco.

The Colony, Frisco, and the District reached an agreement and executed the nineteen-page Contract, entitled, "Stewart Creek West Regional Wastewater System Contract," on May 28, 1998.[3]

Relevant initial portions of the contract are as follows:

WHEREAS, there have been prepared for and filed with the District the following: Report on a Proposed Regional Wastewater System for the Cities of Frisco and The Colony . . . dated February, 1997,

---

[2] Antonio Johnston, The Colony's assistant city manager since 2001, agreed that Lambert "has the most knowledge and best understanding of the negotiations before and leading up to and entry into the contract."

[3] According to Lambert, "It was my understanding after much discussion that [Purefoy] and [Frisco] concluded that if we [The Colony] paid our fair share and we participated in the cost, that it would lower their costs . . . ."

by Hunter Associates Texas, Ltd., Consulting Engineers, Dallas, Texas (the "Engineering Report"); and

WHEREAS, the parties hereto wish to further implement the Engineering Report and provide for the acquisition, construction, improvement, operation and maintenance of a Regional Wastewater System (the "System") for the purpose of providing facilities to adequately receive, transport, treat, and dispose of Wastewater; and

. . . .

WHEREAS, the Participants have deemed it necessary and desirable to contract with the District to provide for the expansion of the Plant and the acquisition, construction, improvement, operation and maintenance of the System to achieve efficiencies of cost and operation; and

. . . .

WHEREAS, the parties hereto recognize these facts:

(a)   That the District will use the payments to be received under this Contract and similar contracts, if any, for the payment of Operation and Maintenance Expense of the System and for the payment of the principal of, redemption premium, if any, and interest on its Bonds . . . .

. . . .

(c)   That the District will issue Bonds from time to time in the future to acquire, construct, extend, enlarge, improve, and/or repair the system.

Relevant definitions contained in the Contract are as follows:

"Annual Payment" means the amount of money estimated as provided in Section 5.03 of this Contract *to be paid to the District*

6

*by Participants as their proportionate share of the Annual Requirement.*

"Annual Requirement" means the total amount of money required for the District to pay all Operation and Maintenance Expense of the System and to pay the principal of, and redemption premium, if any, and interest on its Bonds . . . .

"District's System," "Regional System," "Regional Wastewater System," or "System" means all of the District's facilities acquired, constructed, used, or operated by the District for receiving, transporting, treating, and disposing of Wastewater of and for Participants, pursuant to this Contract (*but excluding . . . any facilities required to transport Wastewater to any Point of Entry of the District's System*) . . . . Said terms *shall include only* those facilities which are acquired, constructed, used, or operated *by the District* to provide service to Participants pursuant to this Contract . . . .

"Participants" means Frisco, The Colony and all Additional Participants.

"Point of Entry" means any point at which Wastewater enters the property on which any Wastewater treatment plant operated by the District is located . . . .

"Wastewater" means Sewage, Industrial Waste, Municipal Waste, Recreational Waste, and Agricultrual Waste, as defined in the Code, together with properly shredded garbage, and such infiltration water that may be present. [Emphasis added.]

Section 2.01, under the heading "Providing of Facilities by the District,"

states in part as follows:

*In order to provide services for receiving, transporting, treating, and disposing of Wastewater for Participants, the District* will use its best efforts to design, acquire, construct, and complete the System, as generally described in the Engineering Report . . ., and

*will operate and maintain the System*, and from time to time enlarge, improve, repair, replace, and/or extend the System to provide service to the Participants. [Emphasis added.]

Relevant portions of the Contract under Article III, entitled "Discharge of

Wastewater and Metering," provide as follows:

Section 3.01. DISCHARGE. *In consideration of the payments to be made under its respective contract with the District, each of the Cities of The Colony and Frisco have and shall have the right to discharge all of its Wastewater from its respective sewer system into the District's system*, provided that such Wastewater meets the requirements for quantity and quality as set forth in its respective contracts with the District . . . .

Section 3.02. POINT OF ENTRY. Each Participant may discharge all such Wastewater generated *from such Participant's sewer system* into the designated Point or Points of Entry for such Participant, unless such Participant and the District mutually agree that like service can be provided elsewhere in the System.

*Section 3.03. CONVEYANCE TO POINT OF ENTRY. It shall be the sole responsibility of each participant to transport, or cause to be transported, at no cost to the other Participants, its Wastewater to its Point or Points of Entry.* [Emphasis added.]

Relevant portions of the Contract under Article V, entitled "Payments,"

are as follows:

Section 5.01. FINANCING. The District will issue its Bonds, in amounts and at times as determined by the District, to provide the System.

Section 5.02. ANNUAL REQUIREMENT. It is acknowledged and agreed that payments to be made under this Contract will be the only source available to the District to provide the Annual Requirement; . . . .

Section 5.03.  PAYMENTS BY CITY.  (a) *For services to be rendered to each Participant by the District under this Contract and other similar contracts, if any, each Participant has agreed to pay, at the time and in the manner hereinafter provided, its proportionate share of the Annual Requirement*, which shall be determined as hereafter described and shall constitute a Participant's Annual Payment or Adjusted Annual Payment. . . .

. . . .

(d)  Each Participant's Annual Payment also shall be adjusted and redetermined for the balance of any applicable Fiscal Year, consistent with the provisions of this contract, and initially based on estimated contributing flow, at any time during any Fiscal Year if:

. . . .

(v)  It appears to the District that for any other reason it will not receive the full amount of the Annual Requirement unless such adjustment and redetermination are made.

. . . .

(h)  . . . Recognizing the fact that the Participants urgently require the facilities and services covered by this Contract, and that such facilities and services are necessary for actual use and for stand-by purposes; and further recognizing that the District will use the payments received from the Participants hereunder to pay, secure, and finance the issuance of its Bonds, *it is hereby agreed that the Participants shall be obligated unconditionally, and without offset or counterclaim, to make the payments designated as the "Bond Service Component" of the Annual Requirement, in the manner provided in this Contract, regardless of whether or not the District actually provides such facilities and services, or whether or not any Participant actually*

9

*receives or uses such facilities and services, and regardless of the validity or performance of the other parts of this or any other contract . . . .* Each Participant further agrees that it *shall be obligated* to make the payments designated as the "Operation and Maintenance Component" of the Annual Requirement . . . .

(i)     . . . Each Participant agrees that it will make such payments to the District on or before the twentieth (20th) day of each month of such Fiscal Year. If any Participant shall dispute the Annual Budget, and proceed as provided in Article VII, such Participant nevertheless promptly shall make the payment or payments determined by the District . . . . [Emphasis added.]

Relevant portions of the Contract under Article VIII, entitled "The System," are as follows:

Section 8.01. INITIAL FACILITIES OF THE SYSTEM. (a) *The System shall initially consist of the Plant*.

(b)     . . . . [T]he District and the Participants agree that this Contract shall constitute an operating agreement with respect to the Plant . . . . [Emphasis added.]

Section 11.01 of the Contract provides that the Contract shall become effective as of the date of its execution.

The Contract thus demonstrates that The Colony, Frisco, and the District entered into an agreement for the District to operate the Stewart Creek West Plant (the "plant") for the purpose of treating The Colony's and Frisco's wastewater, which they were required to transport at their sole responsibility and discharge to the designated point of entry, in exchange for The Colony's

10

and Frisco's annual payments to the District. The Contract further required the District to use The Colony's and Frisco's annual payments to repay the principal and interest on the bonds issued to finance the agreed plant expansion and to pay for the system's operation and maintenance expenses.

Absent from the Contract — and at the heart of the underlying litigation — is a specific recitation of how The Colony and Frisco were to transport their wastewater to the point of entry, which is located at the plant and is within Frisco's borders. Because the point of entry is located at the plant and because the plant is wholly within Frisco's borders, pipelines running from portions of The Colony would necessarily have to run through Frisco. According to Lambert, although there were "discussions" in the latter part of the meetings that he attended leading up to the execution of the Contract concerning how The Colony planned to transport its wastewater to the point of entry, this was a "secondary issue" at the time; "[t]he purchase of capacity was the major victory." The actual negotiations between The Colony and Frisco regarding the means by which The Colony was to transport its wastewater to the point of entry were to be conducted at some point *after* the Contract's execution, and the final agreements concerning the same would be documented in *another* written contract. Lambert thus did not begin those negotiations before leaving The Colony, but he understood that it was the District's obligation to build,

11

maintain, and operate the plant and that The Colony was responsible for transporting its wastewater to the point of entry.

At the time of the Contract's execution, the only "access" that The Colony had to the plant—in terms of transporting its wastewater thereto (excluding the "ludicrous" option of transporting wastewater by truck)—was via an old pipeline that ran between The Colony's Stewart Creek Plant and the plant. Lambert, however, "never really spent any time researching that option," and he did not "remember why it was there or what it was for." Therefore, at the time of the Contract's execution and with the exception of the old pipeline that Lambert had not anticipated utilizing for transporting The Colony's wastewater to the plant, The Colony had not physically built the infrastructure or pipelines necessary to transport wastewater to the plant. Based on the discussions that he had before the Contract was executed, Lambert thought The Colony was going to attempt to implement the 1997 report prepared by Hunter Associates Texas, Ltd. and referenced at the beginning of the Contract, otherwise referred to as the "red book." The "red book" proposed plans for transporting The Colony's wastewater in part by laying pipelines from Wynnewood Peninsula and Austin Ranch to the plant.

During Lambert's tenure as city manager, which ended in the fall of 2000, The Colony did not need the capacity that it had purchased from the District.

12

John Dillard, The Colony's mayor and former city councilman, reasoned that "[w]hen we entered into the Contract, we had no need of their services at that time"; instead, "we had entered into an agreement to pay them for future services." Johnston shared Dillard's recollection, agreeing that The Colony acquired capacity in the plant in 1998 for future use. Lambert therefore anticipated there being a period of time, possibly until 2003 or 2004, in which The Colony made contractual payments but had none of its wastewater treated at the plant.

After execution of the Contract, the District sold $7,125,000 in bonds that it utilized to fund the plant expansion. It completed the expansion sometime in January 2001. The expansion increased the plant's wastewater treatment capacity from 1.5 million gallons per day to a total capacity of 5 million gallons per day.

The Colony made its first payment under the Contract on or about March 1, 1999. After Lambert left his position as city manager of The Colony, he became a consultant for The Colony for six months. Within three months of Lambert's departure from The Colony, he instructed Johnston that he (The Colony) needed to "get the system going" and "initiate the infrastructure into the ground." Johnston understood Lambert's instruction to mean that The Colony was "to begin routing wastewater to the Stewart Creek West plant."

13

In furtherance of Lambert's instructions, between February and June 2001, Johnston contacted the District; met with the Billingsley Corporation, who developed the Austin Ranch property; contacted an individual with Matthews Southwest, the developers of Wynnewood Peninsula; met with The Tomlin Property, who owned the portion of Wynnewood Peninsula inside Frisco; and contacted Frisco. Johnston also introduced Dale Cheatham—The Colony's city manager as of August 1, 2001—to Jim Parks, the District's Executive Director. The Colony had a number of meetings with the District regarding wastewater transportation thereafter.

Notwithstanding the "red book," The Colony eventually hired the engineering firm of Freese and Nichols, Inc. to prepare a report setting forth various alternatives for routing wastewater to the plant. Johnston informed James Baddaker, a Freese and Nichols engineer, about a few "issues" that existed between The Colony and Frisco, and Baddaker gained an understanding "that there may have been impediments to The Colony utilizing or sharing facilities with Frisco in order to get their wastewater flow to the point of delivery at the North Texas plant." The "issues" and "impediments" that Baddaker learned of concerned an unresolved territorial dispute between The Colony and Frisco in which Frisco apparently claimed that The Colony had wrongfully annexed two pieces of land in the 1980s referred to as the

14

"lightning bolt" and the "finger." According to Cheatham, although The Colony's actions "have subsequently been validated by the State, and they are legal now," Frisco was "upset" about it and had asked for the land back. With this considered, the Freese and Nichols report, which is dated August 8, 2003, concluded that there were several options for treating The Colony's wastewater, and it evaluated a number of scenarios that The Colony could have implemented to transport its wastewater to the plant—some of which involved Frisco's cooperation and some which did not.[4] The report also included "timelines," one of which projected that it would take 684 days to complete a system capable of transporting 1.1 million gallons of wastewater per day from The Colony's treatment plant to the plant.

The Colony ultimately "more or less" adopted an alternative plan of "Scenario 1," which involved transporting 1.1 million gallons of wastewater per day to be treated by the District. Freese and Nichols completed the surveying on the project but were told by The Colony thereafter to stop work. The Colony did not undertake steps to follow any of the other scenarios set forth

---

[4] For instance, under "Scenario Number 1," the first few alternatives called for use of existing Frisco easements or utilities. But Alternate 3 assumed that Frisco did not permit use of its pipelines, and it provided for a scenario whereby The Colony would be required to obtain its own easements through the process of condemnation.

in the report, some of which provided plans for diverting wastewater from Austin Ranch and Wynnewood Peninsula to the plant, and it never constructed wastewater lines that would enable it to transport its wastewater to the plant. Instead, it awarded a contract sometime in January 2005 to modify its own wastewater treatment plant at a cost of between $12 and $13 million. The Colony never sent any of its wastewater to the plant for treatment by the District, but the District never denied The Colony its right to access capacity in the plant.

The Colony paid approximately $800,000 to the District from 1999 to 2004 and then ceased making payments under the Contract. Frisco thereafter became responsible for The Colony's share of the payments. Frisco paid $642,863.98 of The Colony's payments due under the Contract.

The Colony filed suit in June 2004. It claimed in part the following in its third amended petition: "In 2002, the Environmental Protection Agency and Texas Commission on Environmental Quality advised Plaintiff that its current wastewater treatment was inadequate, and gave The Colony a twenty-four month deadline for coming into compliance with all applicable regulations"; "Frisco refused to grant access easements or otherwise cooperate unless The Colony would also convey part of its territory to" Frisco; the District advised The Colony that "it could not treat The Colony's wastewater" at the plant; the

16

District "offered The Colony an opportunity to participate in a newly expanding region at an additional cost of approximately $170,000,000, of which [The Colony] would pay its proportionate share"; "both Defendants attempted to negotiate new terms that were materially different from those in the original agreement"; and "[b]oth defendants were unready, unwilling, and unable to abide by the terms of the original agreement."

The Colony sought a declaration that no contract was formed because (1) there was no meeting of the minds regarding a material feature of the Contract, (2) the promise of the District was illusory and created no mutuality of obligation, (3) the terms of the Contract were vague, ambiguous, and not sufficient to bind either defendant, (4) the Contract violates state law, and (5) the Contract violates public policy. The Colony further sought a declaration that it was entitled to the quasi-contractual remedy of unjust enrichment. Alternatively, "in the event [the] court [found] that a valid contract was formed," The Colony sought a declaration that it was entitled to rescind the Contract because (1) there was a failure of consideration, (2) there was a mutual mistake of material fact, (3) the opposing parties expressed an intent not to perform their obligations, (4) there was a unilateral mistake by The Colony, and (5) one or more of the defendants have been unjustly enriched. In addition to asserting a promissory estoppel claim and a request for attorneys'

17

fees, The Colony sought a declaration that its liability under the Contract had been released and extinguished by the defendants' failure to perform in addition to a "writ of mandamus" "[u]pon the issuance of declaratory relief." The Colony's first supplemental petition further alleged a claim for breach of contract against both Frisco and the District. According to Cheatham, The Colony wants the money it paid under the Contract back, and it wants to be removed from the Contract.

Frisco moved for summary judgment on both traditional and no evidence grounds on all of The Colony's claims, and it moved for summary judgment on its breach of contract counterclaim. The District moved for summary judgment on traditional grounds on all of The Colony's claims, but it asserted no evidence grounds for summary judgment on only some of The Colony's claims.[5] With a

---

[5] We thus do not construe the District's motion as moving for summary judgement on no evidence grounds on all of The Colony's claims. Unlike Frisco's motion, which combined its traditional and no evidence grounds for summary judgment on each of The Colony's claims and specifically articulated that there is no evidence to support the challenged element or claim, the District's motion is separated into "Traditional" and "No Evidence" sections, it primarily cites rule of civil procedure 166a(c) throughout its "Traditional Motion for Summary Judgment" section, and the "No Evidence Motion for Summary Judgment" section specifically articulates nine grounds in which the District claims there is no evidence in support thereof. Consequently, pursuant to the applicable standard of review, we will consider these nine grounds under the no evidence standard, but we will consider the other grounds for summary judgment under the traditional standard.

few exceptions, discussed below, the trial court granted Frisco's and the District's motions for summary judgment. This appeal followed the trial.

### III. MOTIONS FOR SUMMARY JUDGMENT

In its first and second issues, The Colony challenges the trial court's grant of summary judgment in favor of Frisco and the District on The Colony's claims and in favor of Frisco on Frisco's breach of contract counterclaim.

#### A. Standards of Review

The no evidence summary judgment standard of review provides that, after an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.*; *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 207 (Tex. 2002). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(i) & cmt.; *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex. 2002).

When reviewing a no evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan,* 199

19

S.W.3d 291, 292 (Tex. 2006). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no evidence summary judgment is not proper. *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied).

Under the traditional motion for summary judgment standard of review, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex. 2002); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *Sw. Elec. Power Co.,* 73 S.W.3d at 215.

When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of the movant's cause of action or defense as a matter of law. *Clear Creek Basin*, 589 S.W.2d at 678.

A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by the defendant. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense. *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *see* Tex. R. Civ. P. 166a(b), (c). To accomplish this, the defendant-movant must present summary judgment evidence that establishes each element of the affirmative defense as a matter of law. *Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 121 (Tex. 1996).

A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim. *See* Tex. R. Civ. P. 166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986).

When a party moves for summary judgment under both rules 166a(c) and 166a(i), we will first review the trial court's judgment under the standards of

21

rule 166a(i). *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex. 2004).[6]

### B. Declaration—No Contract Formed Claims

The Colony sought a declaration that no contract was formed because there was no meeting of the minds, the terms of the Contract are vague and ambiguous, the promises involved in the Contract are illusory and created no mutuality of obligation, the Contract violates the Texas Government Code, and the Contract violates public policy.

#### 1. Meeting of the Minds

Frisco and the District moved for summary judgment on The Colony's claim seeking a declaration that no contract was formed because there was no meeting of the minds. The District sought a summary judgment on this claim on traditional grounds only.

---

[6] The Colony submitted the same summary judgment evidence in response to both Frisco's and the District's motions for summary judgment, with the exception of an "expert report," an administrative memorandum published by the District, the deposition of James Parks, Johnston's 2006 deposition, District responses to The Colony's requests for admission, correspondence between Purefoy and Cheatham, and a letter from Frisco's mayor to Parks. The Colony's summary judgment evidence consists of Johnston's 2005 deposition, Cheatham's deposition, Dillard's deposition, Lambert's deposition, Baddaker's deposition, Randel Dobbs's deposition, the personal notes of Dobbs, an administrative memorandum published by the District, the Contract, and the "red book."

Parties enter into a binding contract when the following elements exist: an offer; an acceptance in strict compliance with the terms of the offer; a meeting of the minds; each party's consent to the terms; and execution and delivery of the contract with the intent that it be mutual and binding. *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App.—San Antonio 1999, pet. denied). "Meeting of the minds" describes the mutual understanding and assent to the agreement regarding the subject matter and the essential terms of the contract. *Weynand v. Weynand*, 990 S.W.2d 843, 846 (Tex. App.—Dallas 1999, pet. denied). Mutual assent, concerning material, essential terms, is a prerequisite to formation of a binding, enforceable contract. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). Parties, however, may agree to the material terms of a contract but leave other matters open for later negotiation; it is only when an essential term is left open for future negotiation that no binding contract exists. *Kelly v. Rio Grande Computerland Group*, 128 S.W.3d 759, 766 (Tex. App.—El Paso 2004, no pet.); *Komet v. Graves*, 40 S.W.3d 596, 602 (Tex. App.—San Antonio 2001, no pet.). The determination of whether there is a meeting of the minds, and thus offer and acceptance, is based upon objective standards of what the parties said and did and not on their subjective state of mind. *Copeland*, 3 S.W.3d at 604.

### a. Frisco

The Colony's sole argument that it raised a genuine issue of material fact on its meeting of the minds claim is that "the parties left the issue of access to the plant open for future negotiation." It contends that the Contract did not set forth where the pipelines would be located, the size of the pipelines, or the timing of the pipeline installation. The Colony thus argues that a fact issue exists on this claim because there was no meeting of the minds regarding how the parties were to transport their wastewater to the plant.

The Contract indeed does not set forth any details of how The Colony and Frisco are to transport their wastewater to the plant. Furthermore, Lambert testified in his deposition that the parties agreed that the point of entry would be at the plant itself but that the negotiations regarding how The Colony intended to transport its wastewater to the point of entry was an issue that was intended to be addressed after the Contract was executed. Although the parties had discussions about "access" before the Contract's execution, Lambert expected the final agreements of how the pipelines were to be constructed to be documented in another written contract.

Although this evidence is undisputed, none of it raises a genuine issue of material fact that no contract was formed for failure to achieve a meeting of the minds because the issue of how The Colony was to transport its wastewater

24

to the plant is neither an essential term of the Contract nor part of the Contract's subject matter; it is thus not a prerequisite for the Contract to be binding and enforceable. This is so because the plain and unambiguous language of the Contract demonstrates that the parties entered into an agreement for the District to provide access to the plant and to treat The Colony's and Frisco's wastewater in exchange for annual payments. The purpose of the Contract is accordingly *treatment—not transportation—of* wastewater. Consistent with this purpose, the Contract deliberately does not account for the means by which wastewater is transported to the point of entry because that is beyond the Contract's scope. Section 3.03 of the Contract specifically provides that it is the "sole responsibility" of The Colony and Frisco to transport their wastewater to the point of entry. The definitions of "District's System," "Regional System," "Regional Wastewater System," or "System" additionally specifically *exclude* from their meaning "any facilities required to transport wastewater to any Point of Entry of the District's System." Moreover, Lambert testified that transportation of wastewater was a "secondary issue" at the time of the Contract's execution and that the purchase of capacity was the "major victory." The Colony subjectively reads more into the Contract than what is there, which is contrary to the objective standard by which we are to view this meeting of the minds issue. *See id.*

25

Because the issue of wastewater transportation is not an essential or material term of the Contract, the parties were free to, as they clearly did, leave this issue open for future negotiation. *See Kelly*, 128 S.W.3d at 766. Accordingly, we hold that The Colony failed to raise a genuine issue of material fact in response to Frisco's challenge to The Colony's claim seeking a declaration that no contract was formed because there was no meeting of the minds and that the trial court did not err by granting Frisco's motion for summary judgment on this ground. *See* Tex. R. Civ. P. 166a(i). We overrule this part of The Colony's first issue.

### b. The District

We reach the same conclusion regarding the District's motion for summary judgment on this ground. The District submitted as summary judgment evidence the Contract, Parks's affidavit, and the deposition testimony of Lambert and Cheatham, among other things. As stated above, the Contract shows that the parties entered into an agreement for the District to provide wastewater treatment for The Colony and Frisco, and the Contract specifically places the responsibility of transporting the wastewater to the point of entry on Frisco and The Colony. Parks affirmed that "[t]he District did not enter into an agreement with The Colony to construct its wastewater transmission lines" and that "[n]o District funds were available for the construction of the Colony's

26

wastewater transportation lines because the Contract expressly placed the obligation for transporting The Colony's wastewater upon The Colony." Consequently, "[h]ow the Colony was to transport its wastewater was outside of the scope of the agreement[,] and no provision was made under the terms of the Contract for [the District] to transport or provide for the transportation of[] The Colony's wastewater." Lambert testified that it was his understanding that The Colony was responsible for transporting its wastewater to the plant and that the negotiations between The Colony and Frisco regarding the utilization of existing pipelines and easements would be conducted later. And although Cheatham thought the District had some obligation to make Frisco give The Colony access to its lines, he agreed that, pursuant to section 3.03 of the Contract, it was The Colony's responsibility to get its wastewater to the plant.

The District having met its summary judgment burden, The Colony relies on the same evidence and argument as it does in the portion of its brief addressing Frisco's motion for summary judgment on this ground. Because there is no evidence that wastewater transportation is an essential or material term of the Contract, we hold that The Colony failed to raise a genuine issue of material fact in response to the District's challenge to The Colony's claim seeking a declaration that no contract was formed because there was no

27

meeting of the minds. *See* Tex. R. Civ. P. 166a(c). Accordingly, the trial court did not err by granting the District's motion for summary judgment on this ground, and we overrule this part of The Colony's second issue.

### 2.    Vague and Ambiguous

Frisco and the District moved for summary judgment on The Colony's claim seeking a declaration that no contract was formed because the terms of the agreement are vague and ambiguous. The District sought summary judgment on this claim on traditional grounds only.

Our primary concern when construing a written contract is to ascertain the true intentions of the parties as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *Heil Co. v. Polar Corp.*, 191 S.W.3d 805, 810 (Tex. App.—Fort Worth 2006, pet. denied). This is achieved by examining and considering the entire writing in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *Coker*, 650 S.W.2d at 393. We presume that the parties to the contract intend every clause to have some effect. *Heritage Res., Inc. v. Nations Bank*, 939 S.W.2d 118, 121 (Tex. 1996); *XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 627 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). We give terms their plain, ordinary, and generally accepted meaning unless the contract shows the parties used them in a technical or different sense.

28

*Heritage Res.*, 939 S.W.2d at 121. When we have the choice of construing a contract as valid or as void, we construe it in such a way as to make it valid. *Mays v. Pierce*, 154 Tex. 487, 494, 281 S.W.2d 79, 82 (1955).

A contract that can be given a definite or certain legal meaning is unambiguous as a matter of law. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). Lack of clarity does not create an ambiguity, and a contract is not ambiguous simply because the parties advance conflicting interpretations. *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003); *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). Rather, a contract is ambiguous when its meaning is uncertain or is reasonably susceptible to more than one meaning. *Coker*, 650 S.W.2d at 393.

In the event that two provisions of a contract arguably conflict, courts apply rules of construction to harmonize the provisions. *Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 332 (Tex. 1983). A specific provision controls over a general provision. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994). Where the meaning of a contract is unambiguous, a party's construction is immaterial. *718 Assocs. Ltd. v. Sunwest N.O.P., Inc.*, 1 S.W.3d 355, 360 (Tex. App.—Waco 1999, pet. denied). Regarding recitals in a contract, "[a]s a general rule, recitals . . . will not control the operative

clauses thereof unless the latter are ambiguous . . . ." *Gardner v. Smith*, 168 S.W.2d 278, 280 (Tex. Civ. App.—Beaumont 1942, no writ).  "[W]here the recitals are broader than the contract stipulations, the former will not extend the latter." *Id*.

### a.    Frisco

The Colony argues that it raised a genuine issue of material fact that the Contract is vague and ambiguous because the Contract is "susceptible to multiple interpretations by differing experienced professionals" and because "the parties entered into the agreement with differing interpretations regarding their respective rights and obligations."  Thus, multiple interpretations is the basis of The Colony's arguments.

The Colony relies in part on Johnston's deposition testimony in which he explains the basis of his opinion that the District breached the Contract.  One reason that he thought the District breached the Contract was that he interpreted the Contract as requiring the District to work with The Colony in setting up pipelines by which to transport The Colony's wastewater to the plant.  The basis of Johnston's interpretation is the "red book," which is mentioned at the beginning of the agreement pursuant to a "Whereas" statement that the "red book" has been "prepared for and filed with the District" and that "the parties hereto wish to further implement the" "red book"

30

and "provide for the acquisition, construction, improvement, operation and maintenance of a Regional Wastewater System (the "System") for the purpose of providing facilities to adequately receive, *transport*, treat, and dispose of Wastewater." [Emphasis added.]

The Colony also relies on the deposition testimony of Cheatham to raise a fact issue. In construing section 2.01, which provides that the District "will use its best efforts to design, acquire, construct, and complete the System" in order to "provide services for receiving, *transporting*, treating, and disposing" of wastewater, Cheatham testified that he thought the District had not complied with the "best efforts" language because the pipelines set forth in the "red book" had not been constructed yet. [Emphasis added.] According to Cheatham, the District had a responsibility to ensure that the pipelines would be constructed by requiring Frisco to give The Colony access to its existing pipelines and easements.

The Colony further relies on Dillard's deposition testimony in which he elaborated on his interpretation of the Contract and on his opinions regarding the District's failures to comply with the Contract. Dillard opined that the District failed to comply with the initial portion of the Contract stating that there has been a report prepared (the "red book"); that the parties wished to implement the report; and that they would provide for the acquisition,

31

construction, improvement, operation, and maintenance of the System in order to provide facilities to adequately receive, transport, treat, and dispose of wastewater. From the first page alone, Dilliard interpreted the Contract to require the District to "basically acquire what's necessary for us [The Colony] to link up with their plant to become part of the regional wastewater treatment plant, to include easements, the pipes, the pumping station, and anything else necessary for us to receive services for the present and the future."

Dillard also opined that the portion of the Contract stating that the District would issue bonds from time to time in the future to acquire, construct, extend, enlarge, improve, "and/or" repair the system imposes an obligation on the District to acquire easements and construct the pipelines to facilitate The Colony's transportation of its wastewater to the plant. According to Dillard, the District is supposed "to design it, they are to acquire and construct." The Colony, on the other hand, is obligated to "deliver the effluent from our plant. Our responsibility is merely to provide the effluent. They are to provide the design, acquisition[,] and construction." Dillard opined that the District "did not produce the hardware for their plant hookup."

The Colony thus contends that there is a fact issue concerning its vague and ambiguous claim based on the multiple interpretations of the portions of the Contracts relating to (1) implementation of the "red book" for, among other

32

things, the purpose of transporting wastewater, (2) the issuance of bonds to acquire and construct the System, and (3) the best efforts that the District is to use to provide services for, among other things, the transportation of wastewater. None of this evidence, however, raises a genuine issue of material fact that the Contract is vague and ambiguous because each of the interpretations conflict with the well established rules of contract construction set forth above.

The interpretations ignore the requirement that we ascertain the true intent of the parties by examining and considering the entire Contract to give effect to *all* of the Contract's provisions. *See Coker*, 650 S.W.2d at 393. The Colony's reliance on the portions of the Contract that they claim raise a fact issue regarding multiple interpretations rests entirely upon a reading and interpretation of those parts of the Contract in isolation. Although there are initial portions of the Contract that *generally* refer to implementation of the "red book" for the purpose of transporting wastewater, the issuance of bonds to acquire and construct the System, and the best efforts that the District is to use to provide services for the transportation of wastewater, an examination of the *entire* Contract demonstrates that it specifically addresses the issue of transportation when it (1) clarifies that The Colony and Frisco are solely responsible for transporting their wastewater to the point of entry, (2) excludes

33

facilities required to transport wastewater from the definition of "System," (3) includes only those facilities that are acquired, constructed, used, or operated *by the District* to provide wastewater treatment services in the definition of "System," and (4) defines the "System" as consisting of the "Plant" and nothing else. These are specific provisions addressing the matter of wastewater transportation, and they accordingly control over the general, isolated statements referring to "transportation" that The Colony relies on. *See Forbau*, 876 S.W.2d at 133–34.

The Colony's interpretations of the Contract are likewise adverse to the presumption that the parties intended every clause of the Contract to have some effect and additionally result in the rendering meaningless of significant parts of the Contract specifically addressing wastewater transportation. *See Heritage Res., Inc.*, 939 S.W.2d at 121. Thus, it is only when we examine the entire Contract and give effect to all of its provisions that the true intent of the parties regarding wastewater transportation is clearly revealed: the District promised to treat—not transport—The Colony's and Frisco's wastewater in exchange for annual payments.

Moreover, The Colony cannot raise a fact issue regarding the Contract's alleged ambiguity simply by advancing the conflicting interpretations of its city officials; the Contract is ambiguous only if it is "reasonably susceptible" to

34

more than one meaning. *See Coker*, 650 S.W.2d at 393. None of the interpretations advanced by The Colony are "reasonable" because they unquestionably conflict with fundamental rules of contract construction. Consequently, the Contract is not reasonably susceptible to any of the interpretations proposed by The Colony. Indeed, conversely, our analysis shows that the Contract is unambiguous as a matter of law because it can be given a definite or certain legal meaning. *See id*.

We hold that The Colony failed to raise a genuine issue of material fact in response to Frisco's challenge to The Colony's claim seeking a declaration that no contract was formed because the terms of the agreement are vague and ambiguous and that the trial court did not err by granting Frisco's motion for summary judgment on this ground. *See* Tex. R. Civ. P. 166a(i). Accordingly, we overrule this part of The Colony's first issue.

### b. The District

The Colony relies on the same evidence and argument as it does in the portion of its brief addressing Frisco's motion for summary judgment on this ground. We thus reach the same conclusion regarding the District's motion for summary judgment on this ground. We hold that The Colony failed to raise a genuine issue of material fact in response to the District's challenge to The Colony's claim seeking a declaration that no contract was formed because the

35

terms of the agreement are vague and ambiguous and that the trial court did not err by granting the District's motion for summary judgment on this ground. *See* Tex. R. Civ. P. 166a(c). We overrule this part of The Colony's second issue.

### 3. Illusory and Mutuality of Obligation

Frisco and the District moved for summary judgment on The Colony's claim seeking a declaration that no contract was formed because the promises involved in the Contract were illusory and created no mutuality of obligation. Both Frisco and the District moved for summary judgment on no evidence grounds.

A bilateral contract is one in which there are mutual promises between two parties to the contract, each being both a promisor and a promisee. *Hutchings v. Slemons*, 141 Tex. 448, 174 S.W.2d 487, 489 (1943). A bilateral contract must be based upon a valid consideration, in other words, mutuality of obligation. *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 409 (Tex. 1997). Consideration may consist of either benefits or detriments to the contracting parties—it may consist of some right, interest, profit, or benefit that accrues to one party, or alternatively, of some forbearance, loss, or responsibility that is undertaken or incurred by the other party. *In re C&H News Co.*, 133 S.W.3d 642, 647 (Tex. App.—Corpus Christi 2003, orig. proceeding).

36

The existence of a written contract presumes consideration for its execution. *Doncaster v. Hernaiz*, 161 S.W.3d 594, 603 (Tex. App.—San Antonio 2005, no pet.).

A contract that lacks mutuality of obligation is illusory and void and thus unenforceable. *Tex. S. Univ. v. State Street Bank & Trust Co.*, 212 S.W.3d 893, 914 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). An illusory promise of performance invalidates a bilateral contract. *Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 645 (Tex. 1994). A promise is illusory when it fails to bind the promisor who retains the option of discontinuing performance. *Id.*; *D.R. Horton, Inc. v. Brooks*, 207 S.W.3d 862, 867 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

### a.    Frisco

The Colony argues that its summary judgment evidence establishes that "Frisco did not consider itself to be bound by any of the provisions in the contract." The only argument that The Colony advances to support this broad contention is that Frisco did not cooperate with The Colony in allowing access to its pipelines or easements. Specifically, The Colony is referring to summary judgment evidence regarding the ongoing, municipal dispute between itself and Frisco over the land known as the "lightning bolt" and the "finger."

The Colony's evidence shows that it annexed the disputed land some time in the 1980s, that a portion of the land was in Frisco's extraterritorial jurisdiction, that Frisco "didn't like" what The Colony had done, and that Frisco wants the land back. During his deposition, Cheatham discussed an October 23, 2002 letter addressed to Frisco's mayor in which The Colony's mayor indicated that she had received a "proposed boundary adjustment agreement" from Purefoy that requested The Colony to relinquish the "lightning bolt," the "finger," and possibly some additional land. The following exchange then occurred:

> [The District's attorney]: All right. And so it's your understanding that, at least at this point in time, the proposition proposal by the City of Frisco in October of 2002 was that you give up this 1499.462 acres, and in exchange the City of The Colony would be granted access to Frisco's sewer lines and easements to get to the Stewart Creek West facility?
>
> [Cheatham]: Based on this, that would appear to be the case.

Johnston's deposition testimony reflected Cheatham's deposition testimony. He opined that the annexation dispute served as the basis for Frisco's "refusal" to allow The Colony access to its easements and that Frisco would have given The Colony access to its existing lines if the Colony had relinquished its claim to the disputed land.

38

The Colony also submitted a few emails between Cheatham and Purefoy in which they discuss the annexation issue. Purefoy indicated in one email that Frisco wanted the "annexation issue" to be resolved before "moving forward on the sewer line issue."

None of this evidence concerning the boundary dispute between Frisco and The Colony raises a genuine issue of material fact regarding The Colony's claim that Frisco's obligations under the Contract were illusory or lacking mutuality of obligation because the issue of and the circumstances surrounding The Colony's negotiations with Frisco for pipelines or easement access are distinct from and beyond the scope of Frisco's obligations under the Contract.

We look to the Contract first. It outlines Frisco's obligations, which include, but are not limited to, Frisco's right to discharge wastewater into the System in consideration for payments to the District, Frisco's agreement to limit discharge into the System that complies with quality requirements that the District may establish, and Frisco's agreement to make payments to the District "for services to be rendered to each Participant." As we have already discussed, the Contract makes clear that transportation of wastewater to the plant is the sole responsibility of Frisco and The Colony. Other than this, the Contract does not set forth any terms and conditions regarding The Colony's or Frisco's transportation of wastewater to the point of entry. Consequently,

39

the terms set forth within the four corners of the Contract impose no wastewater transportation obligations on Frisco in which Frisco retains the option of performing or not performing those obligations. *See Light*, 883 S.W.2d at 645.

The "set forth within the four corners of the Contract" language immediately above is significant because The Colony's argument centers on facts surrounding an issue that is beyond Frisco's obligations under the Contract. According to Lambert, whom Johnston agreed "has the most knowledge and best understanding of the negotiations before and leading up to and entry into the contract," the major victory for The Colony was the capacity that it acquired in the plant. There were discussions in the latter part of the meetings leading up to the execution of the Contract regarding wastewater transportation, but Lambert described this as a "secondary issue." The actual negotiations between The Colony and Frisco regarding wastewater transportation to the point of entry were to be conducted at some point after the Contract's execution, and the final agreements concerning the same would be documented in another written contract. Lambert's testimony is thus not inconsistent with the terms of the Contract.

As Lambert contemplated, The Colony and Frisco negotiated the issue of wastewater transportation *after* the Contract had been executed, which was

40

also after The Colony had made payments to the District pursuant to the terms of the Contract.[7] The summary judgment evidence shows that it is only at this point—after the Contract had been executed—that the border dispute between The Colony and Frisco over the "lightning bolt" and the "finger" became an issue in the context of this case.

The summary judgment evidence thus demonstrates that the circumstances surrounding the post-Contract wastewater negotiations between The Colony and Frisco are mutually exclusive of Frisco's general obligations under the Contract. Frisco's obligations under the Contract are not rendered illusory simply because The Colony and Frisco never reached an agreement on the wastewater transportation issue. *See id*. And nothing in the Contract addresses or limits Frisco's post-Contract ability to negotiate issues not addressed in the Contract. At least one individual associated with The Colony seems to have recognized that the border dispute and the failed negotiations between The Colony and Frisco concerning the issue of wastewater transportation are matters beyond the scope of the Contract. Lambert testified:

> [The District's attorney]: But as far as making that final jump from
> Austin Ranch and Wynnewood Peninsula across the City of Frisco

---

[7] According to Cheatham and Johnston, The Colony would have had access to Frisco's pipelines or easements had it agreed to Frisco's terms, but it chose not to make a deal.

to the Stewart West plant, you didn't start those negotiations before you left, correct?

[Lambert]: To my eternal shame, no, I did not start those negotiations before I left.

We hold that The Colony failed to raise a genuine issue of material fact in response to Frisco's challenge to The Colony's claim seeking a declaration that no contract was formed because the promises involved in the Contract were illusory and created no mutuality of obligation and that the trial court did not err by granting Frisco's motion for summary judgment on this ground. *See* Tex. R. Civ. P. 166a(i). We overrule this part of The Colony's first issue.

### b.    The District

As for the District, The Colony's specific argument seems to be that the District was not bound by its obligation to treat The Colony's wastewater because the District did not have the capacity to accept The Colony's wastewater. According to The Colony, "No benefit is gained by Plaintiff transporting its wastewater to a plant that does not have capacity to treat it." The Colony directs us to summary judgment evidence that it contends shows that the District did not have the capacity to treat its wastewater. Assuming without deciding that this evidence shows that the District did not have the capacity to treat its wastewater, it nonetheless does not raise a genuine issue of material fact in support of The Colony's illusory or mutuality of obligation

42

claim because it is evidence of a possible breach of contract, not of an illusory obligation.

The Contract sets forth the District's obligations, including that the District will issue bonds to provide for the System; that the District will use its best efforts to design, acquire, construct, and complete the System; and that the District will operate and maintain the System to provide service to The Colony and Frisco. Cheatham agreed at his deposition that to the best of his knowledge, the District has been willing to provide wastewater treatment for The Colony and that this in turn provided value to The Colony. Lambert testified to the same, opining that the signing of the Contract gave The Colony value, i.e., capacity in the plant.

The Contract thus bound the District to provide capacity to The Colony for wastewater treatment in exchange for payments. This obligation is not illusory because the District may not choose to disavow or ignore it at its option. *See Brooks*, 207 S.W.3d at 867. Nor are the District's capacity and treatment obligations illusory if the District fails to abide by those obligations. That is a set of circumstances more appropriately addressed in a breach of contract context because it concerns an alleged failure by the District to abide by the terms of the Contract. We hold that The Colony failed to raise a genuine issue of material fact in response to the District's challenge to The Colony's

43

claim seeking a declaration that no contract was formed because the promises involved in the Contract were illusory and created no mutuality of obligation and that the trial court did not err by granting the District's motion for summary judgment on this ground. *See* Tex. R. Civ. P. 166a(i). We overrule this part of The Colony's second issue.

### 4. State Law Violation

Frisco and the District moved for summary judgment on The Colony's claim seeking a declaration that the Contract violates the government code. Both Frisco and the District moved for summary judgment on no evidence grounds.

Chapter 791 of the government code covers interlocal cooperation contracts. Tex. Gov't Code Ann. §§ 791.001–.033 (Vernon 2004 & Supp. 2008). The purpose of the chapter is to increase the efficiency and effectiveness of local governments by authorizing them to contract with one another and with agencies of the state. *Id*. § 791.001. The chapter expressly allows for contracts between a municipality and a district or river authority for wastewater treatment facilities. *Id*. § 791.026(a)(1).

The Colony alleged in its third amended original petition that the Contract is null and void for failure to comply with government code sections 791.011(d)(2) and 791.011(e). Section 791.011(d)(2) provides that an

44

interlocal contract must "state the purpose, terms, rights, and duties of the contracting parties." *Id*. § 791.011(d)(2). Section 791.011(e) provides that "[a]n interlocal contractual payment must be in an amount that fairly compensates the performing party for the services or functions performed under the Contract." *Id*. § 791.011(e).

The Colony's sole argument under section 791.011(d)(2) is that it "introduced summary judgment evidence to raise a genuine fact issue regarding meeting of the minds" and that "[i]f there is an outstanding fact issue about meeting of the minds, it follows that there must also be a genuine factual dispute as to whether the agreement sufficiently stated the rights and duties of the contracting parties." We determined above that The Colony failed to raise a genuine issue of material fact on its meeting of the minds claim. Because The Colony failed to raise a genuine issue of material fact on that claim, its government code section 791.011(d)(2) claim must fail as well. The Colony does not rely on any additional evidence or submit any other argument in its brief challenging the trial court's grant of summary judgment in favor of the District on this ground.

As for The Colony's section 791.011(e) claim, it contends that a genuine issue of material fact issue exists regarding fair compensation because it made payments under the Contract but never had any of its wastewater treated by

45

the District.  It directs us to summary judgment evidence showing that it made contractual payments to the District and that Freese and Nichols performed a survey in furtherance of a routing plan.

It has long been recognized that when statutory language is clear and unambiguous, a statute should be given its plain meaning. *Employers Cas. Co. v. Dyess*, 957 S.W.2d 884, 889 (Tex. App.—Amarillo 1997, writ denied). Section 791.011(e)'s purpose is apparent.  It requires that payments under an interlocal contract fairly compensate the performing party. *Id*.  In this case, section 5.03 of the Contract, "Payments by City," provides, "For services to be rendered to each Participant by the District under this Contract . . ., each Participant has agreed to pay . . . its proportionate share of the Annual Requirement . . . ."  As applied, section 791.011(e) requires that The Colony's and Frisco's payments to the District be in an amount that fairly compensates the District for the services it performs under the Contract.  The Colony's argument relying on section 791.011(e) is thus misplaced because The Colony is the party that made the payments under the Contract to the District; the District did not make payments to The Colony.  The plain language of section 791.011(e) does not support The Colony's argument, nor does The Colony provide any support for its interpretation of the statute requiring that the services provided by the payee (the District) be fair to the payor (The Colony).

46

The Colony does not rely on any additional evidence or submit any other argument in its brief challenging the trial court's grant of summary judgment in favor of the District on this ground.

We hold that The Colony failed to raise a genuine issue of material fact in response to both Frisco's and the District's challenges to The Colony's claim seeking a declaration that the Contract violates the government code and that the trial court did not err by granting Frisco's and the District's motions for summary judgment on this ground. *See* Tex. R. Civ. P. 166a(i). Accordingly, we overrule this part of The Colony's first and second issues.

### 5. Violation of Public Policy

Frisco and the District moved for summary judgment on The Colony's claim seeking a declaration that the Contract was never formed because it violates public policy. The District sought a summary judgment on this claim on traditional grounds only.

Parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 129 (Tex. 2004) (orig. proceeding). Public policy can be a vague and uncertain term, and it is up to the power of the lawmaking body to define. *Tex. Commerce Bank, N.A., v. Grizzle*, 96 S.W.3d 240, 250 (Tex. 2002). Texas's public policy is thus embodied in its constitution,

47

statutes, and judicial decisions. *Id.*; *Classic Century, Inc. v. Deer Creek Estates, Inc.*, No. 02-06-00104-CV, 2008 WL 3540194, at *5 (Tex. App.—Fort Worth Aug. 14, 2008, no pet. h.) (mem. op.). The appropriate test when considering whether a contract violates public policy "is whether the tendency of the agreement is injurious to the public good, not whether its application in a particular case results in actual injury." *Jankowiak v. Allstate Prop. & Cas. Ins. Co.*, 201 S.W.3d 200, 210 (Tex. App.—Houston [14th Dist.] 2006, no pet.). Without clear legislative intent to prohibit agreements, and absent any claim of fraud, duress, accident, mistake, or failure or inadequacy of consideration, Texas courts generally decline to declare contractual agreements void on public policy grounds. *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 664 (Tex. 2008).

### a.   Frisco

The Colony argues that it was ordered in 2002 or 2003 by the Texas Commission on Environmental Quality ("TCEQ") to bring its wastewater treatment facilities into compliance with effluent and capacity regulations, that "Frisco's conduct resulted in The Colony having to pay millions of taxpayer dollars to expand and improve its aging treatment plant to the detriment of the general public," and, therefore, that the Contract "violate[s] public policy governing the careful spending of public resources." The Colony submitted

48

summary judgment evidence regarding the TCEQ orders to revise its wastewater treatment facilities, the general details behind The Colony's decision to become involved with the District, and, among other things, the circumstances surrounding The Colony's decision to begin the process of preparing for transportation of its wastewater to the plant. The Colony's evidence does not raise a genuine issue of material fact that the Contract is void for violating public policy.

The Contract sets forth a scheme by which The Colony and Frisco pay the District to accept and treat their wastewater. As addressed in the preceding section, the government code expressly allows for this particular type of contract. *See* Tex. Gov't Code Ann. § 791.026(a)(1) ("A municipality, district, or river authority of this state may contract with another municipality, district, or river authority of this state to obtain or provide part or all of" "water supply or wastewater treatment facilities."). Contrary to The Colony's argument, the government code reflects a public policy that permits the execution of this particular type of agreement. That The Colony ultimately spent between $12 and $13 million to upgrade its own treatment plant does not render the Contract violative of public policy. We hold that The Colony failed to raise a genuine issue of material fact in response to Frisco's challenge to The Colony's claim seeking a declaration that the Contract was never formed

because it violates public policy and that the trial court did not err by granting Frisco's motion for summary judgment on this ground. *See* Tex. R. Civ. P. 166a(i). Accordingly, we overrule this part of The Colony's first issue.

### b. The District

The District submitted the Contract into evidence and met its summary judgment burden. The Colony does not rely on any additional evidence or submit any other argument in its brief challenging the trial court's grant of summary judgment in favor of the District on this ground. We hold that The Colony failed to raise a genuine issue of material fact in response to the District's challenge to The Colony's claim seeking a declaration that the Contract was never formed because it violates public policy and that the trial court did not err by granting the District's motion for summary judgment on this ground. *See* Tex. R. Civ. P. 166a(c). Accordingly, we overrule this part of The Colony's second issue.

### C. Declaration—Unjust Enrichment

Frisco and the District moved for summary judgment on The Colony's claim seeking a declaration that "it is entitled to the quasi-contractual remedy of unjust enrichment." Both Frisco and the District moved for summary judgment on no evidence grounds.

50

Unjust enrichment is an equitable principle holding that one who receives benefits unjustly should make restitution for those benefits. *Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App.—San Antonio 2004, pet. denied). Unjust enrichment occurs when the person sought to be charged has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain. *Id*. Thus, a party may recover under the theory of unjust enrichment when one person has obtained a benefit from another by fraud, duress, or the other taking of an undue advantage. *Heldenfeld Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

Generally speaking, however, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory, such as unjust enrichment. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000); *DeClaire v. G&B Mcintosh Family Ltd. P'ship*, 260 S.W.3d 34, 49 (Tex. App.—Houston [1st Dist.] 2008, no pet. h.). This is because parties should be bound by their express agreements, and when a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express terms of the agreement. *Conoco*, 52 S.W.3d at 684; *see also Edwards v. Mid-Continent Office Distribs., L.P.*, 252 S.W.3d 833, 837 (Tex. App.—Dallas 2008, pet. denied) ("The doctrine of unjust enrichment applies the principles of restitution to disputes

51

that are not governed by a contract between the parties."). An exception to this rule is when overpayment was made under a valid contract. *Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467, 469–70 (Tex. 1998).

Here, The Colony directs us to summary judgment evidence that Johnston, Cheatham, and Dillard thought that the outcome of the Contract was "exceedingly unfair to The Colony" because "The Colony never had a single drop of wastewater treated." Notwithstanding this evidence, the remedy of unjust enrichment is not available to The Colony because there is a valid, express contract governing the dispute, and recovery under this equitable doctrine would be inconsistent with the express terms of the Contract. *See Fortune Prod. Co.*, 52 S.W.3d at 684. The Colony does not argue—nor does the summary judgment evidence demonstrate—that it overpaid under the Contract, only that it never had any of its wastewater treated despite making payments under the Contract. We hold that The Colony failed to raise a genuine issue of material fact in response to both Frisco's and the District's challenges to The Colony's request for a declaration that it is entitled to the remedy of unjust enrichment and that the trial court did not err by granting Frisco's and the District's motions for summary judgment on this ground. *See* Tex. R. Civ. P. 166a(i). Accordingly, we overrule this part of The Colony's first and second issues.

52

**D.    Declaration—Equitable Remedy of Rescission**

The Colony alternatively sought a declaration that it is entitled to rescind the Contract because of a failure of consideration, a mutual mistake of fact, a unilateral mistake of fact, repudiation of the Contract by Frisco and the District, or the unjust enrichment of Frisco or the District.

Rescission is an equitable remedy that seeks to set aside an otherwise legal contract due to fraud, mistake, or for some other reason when it is necessary to avoid unjust enrichment of the non complaining party to the contract, so that the parties thereto may be restored, insofar as is possible, to the status or position they were in prior to execution of the contract. *Isaacs v. Bishop*, 249 S.W.3d 100, 109 (Tex. App.—Texarkana 2008, pet. denied); *Martin v. Cadle Co.*, 133 S.W.3d 897, 903 (Tex. App.—Dallas 2004, pet. denied); *Barker v. Roelke*, 105 S.W.3d 75, 84 (Tex. App.—Eastland 2003, pet. denied).  Rescission is thus an "undoing" of the contract and generally used as a substitute for monetary damages when such damages would not be adequate. *Isaacs*, 249 S.W.3d at 109; *Am. Apparel Prods., Inc. v. Brabs, Inc.*, 880 S.W.2d 267, 270 (Tex. App.—Houston [14th Dist] 1994, no writ).

**1.    Frisco's Ratification Affirmative Defense**

Before addressing The Colony's issues complaining of the trial court's grant of summary judgment in favor of Frisco and the District on The Colony's

rescission theories, we must first determine whether the trial court properly granted Frisco summary judgment on its ratification affirmative defense. If the trial court properly granted Frisco summary judgement on its ratification affirmative defense, we need not consider whether the trial court properly granted Frisco summary judgment on each of The Colony's rescission theories because The Colony's ratification of the Contract would have precluded it from subsequently avoiding the Contract under the equitable remedy of rescission. *See Isaacs*, 249 S.W.3d at 110 n.9 (stating that once a party ratifies a contract, it may not later withdraw its ratification and seek to avoid the contract); *Barker*, 105 S.W.3d at 84 (same).

Ratification is the adoption or confirmation, by one with knowledge of all material facts, of a prior act *which did not then legally bind that person* and which that person had *the right to repudiate*. *EOG Res., Inc. v. Wall*, 160 S.W.3d 130, 138 (Tex. App.—Tyler 2005, no pet.); *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 764 (Tex. App.—Texarkana 1992, writ denied); *see also Miller v. Kennedy & Minshew, Prof'l. Corp.*, 142 S.W.3d 325, 342 (Tex. App.—Fort Worth 2003, pet. denied) (stating that a person ratifies an *unauthorized* act if, by word or conduct, with knowledge of all material facts, he confirms or recognizes the act as valid). In other words, if a party by its conduct recognizes a contract as valid, having knowledge of all relevant facts,

it ratifies the contract. *Barrand, Inc. v. Whataburger, Inc.*, 214 S.W.3d 122, 146 (Tex. App.—Corpus Christi 2006, pet. denied); *Barker*, 105 S.W.3d at 84. Whether a party has ratified a contract may be determined as a matter of law if the evidence is not controverted or is incontrovertible. *Barrand, Inc.*, 214 S.W.3d at 146.

We determined above that the trial court did not err by granting Frisco summary judgment on The Colony's claim seeking a declaration that no contract was formed. The enforceable Contract legally bound the parties to perform their respective obligations set forth therein. Consequently, there is no evidence that The Colony ratified an agreement that it was not legally bound to comply with and that it had a right to repudiate. *See Wall*, 160 S.W.3d at 138; *Vessels*, 823 S.W.2d at 764. Frisco argues that The Colony ratified the Contract by making contractual payments, but The Colony's summary judgment evidence shows that it discontinued contractual payments around the time that it learned of issues relating to the alleged lack of plant capacity.

We hold that Frisco did not prove its ratification defense as a matter of law and that the trial court erred by granting Frisco summary judgment on this affirmative defense. *See Hood,* 924 S.W.2d at 121 (requiring movant to present summary judgment evidence that establishes each element of its affirmative defense as a matter of law). Because Frisco was not entitled to

55

summary judgment on its ratification affirmative defense as a matter of law, we will consider whether the trial court erred by granting Frisco summary judgment on the rescission theories pleaded by The Colony. *See Isaacs*, 249 S.W.3d at 110 n.9.[8]

## 2. Failure of Consideration

Frisco and the District moved for summary judgment on The Colony's claim seeking a declaration that it is entitled to rescind the Contract due to a failure of consideration. Both Frisco and the District moved for summary judgment on no evidence grounds.

Above, we discussed that "lack of consideration" refers to a contract that lacks mutuality of obligation. *Fed. Sign*, 951 S.W.2d at 409. Failure of consideration, however, occurs when, due to a supervening cause after an agreement is reached, the promised performance fails. *U.S. Bank, N.A. v. Prestige Ford Garland Ltd. P'ship*, 170 S.W.3d 272, 279 (Tex. App.—Dallas 2005, no pet.). The distinction between the two is that lack of consideration exists, if at all, immediately after the execution of the contract while failure of consideration arises because of subsequent events. *Belew v. Rector*, 202 S.W.3d 849, 854 n.4 (Tex. App.—Eastland 2006, no pet.). Thus, failure of

---

[8] We, of course, must also determine whether the trial court erred by granting the District summary judgment on The Colony's rescission theories.

consideration may result as a consequence of one party's failure to perform its obligations under the agreement, resulting in the other party's failure to receive the consideration set forth in the agreement. *U.S. Bank, N.A.*, 170 S.W.3d at 279.

### a. Frisco

The Colony devotes three sentences in support of its argument that it raised a genuine issue of material fact on its failure of consideration issue. It states, "It is uncontroverted that The Colony never had any wastewater treated at the Plant," "It is uncontroverted that The Colony entered into the agreement for the purpose of obtaining wastewater treatment," and "It is uncontroverted that Frisco refused to allow access to the Plant and [the District] refused to force the issue." Thus, the "supervening cause" that The Colony claims caused a post-Contract failure of consideration is Frisco's "refusal" to give The Colony access to its easements or pipelines. This is no evidence of a failure of consideration.

Initially, the summary judgment evidence demonstrates that The Colony and Frisco unsuccessfully negotiated the wastewater transportation issue before The Colony filed suit. Johnston testified as follows:

> [Johnston]: Well, what happened is they requested the finger and gave the finger, and then they requested the finger and the lightning bolt, and then they requested the finger, the lightning bolt

57

and it was like a fan area. An then at that point, we didn't know where it stood.

[The District's attorney]: So, ultimately, you never agreed - - the City of The Colony never agreed to give all of that land in exchange for access, correct?

[Johnston]: We were willing to. We had been given instructions to give them that land.

[The District's attorney]: By whom?

[Johnston]: By the council.

[The District's attorney]: But you were still attempting to negotiate a deal with the City of Frisco whereby you didn't have to part with that land to get the access as of June 3, 2004?

[Johnston]: Yes.

[The District's attorney]: And then you went ahead and filed suit shortly thereafter on June 8, 2004, correct?

[Johnston]: Yes.

[The District's attorney]: Which was five days later?

[Johnston]: Five days later.

Thus, The Colony's statement that Frisco "refused" to allow The Colony access to its pipelines or easements must be considered in light of the relevant summary judgment evidence.

As our analyses above demonstrate, the Contract does not set forth any obligations regarding The Colony's or Frisco's transportation of wastewater to

58

the point of entry. This was an issue to be addressed after the Contract was executed and in a separate agreement. Frisco also does not have an obligation under the Contract to give The Colony access to its pipelines or easements, nor does the Contract limit Frisco's ability to bargain for something in exchange for giving The Colony access to its pipelines or easements (in this case the "lightning bolt" and "finger").

Equity also does not favor The Colony. Cheatham testified about his remarks in an email opining that The Colony did not make adequate preparations for wastewater transportation in the Contract. He testified:

[The District's attorney]: I'm going to hand you what's been marked Deposition Exhibit No. 9. Can you identify that document?

[Cheatham]: It is an e-mail from me to the city council dated November 19th, 2002.

[The District's attorney]: And you agree that this is the e-mail that you sent to city council at that time, a true and correct copy?

[Cheatham]: I - - I believe that to be the case.

[The District's attorney]: If I could please have you look at the last paragraph on page 1. Read that aloud.

[Cheatham]: As indicated above we have an agreement with Frisco and North Texas Municipal Water District on the Stewart Creek plant. Unfortunately, when we entered into the agreement, we didn't make adequate - -

THE REPORTER: Sir, could you slow down for me, please, when you're reading?

59

[Cheatham]: *Unfortunately, when we entered into the agreement, we didn't make adequate preparations for getting lines to the plant*. [Emphasis added.]

The Colony's summary judgment evidence does not support its equitable contention that it should be able to "undo" the Contract because it—not Frisco—is the party ultimately responsible for not making "adequate preparations for getting [its] lines to the plant."

We hold that The Colony failed to raise a genuine issue of material fact in response to Frisco's challenge to The Colony's request for a declaration that it is entitled to rescind the Contract for failure of consideration and that the trial court did not err by granting Frisco's motion for summary judgment on this ground. *See* Tex. R. Civ. P. 166a(i). Accordingly, we overrule this part of The Colony's first issue.

### b. The District

Turning to the District's motion for summary judgment, The Colony argues that it raised a genuine issue of material fact that the District's consideration failed because the capacity that The Colony had purchased did not exist when "enforcement was sought." Whether the District had sufficient capacity at the plant to treat The Colony's wastewater, however, is an issue that survived summary judgment and went to trial. The trial court's order granting the District's motion for summary judgment states, "The Colony's

60

cause of action that [the District] breached its obligation to provide wastewater treatment services to The Colony at the 'Point of Entry' to the District's System is hereby retained for trial." It continues, "The Court finds this to be the sole genuine issue of material fact regarding any cause of action pleaded by The Colony against [the District] which remains to be determined by the jury." There was even a jury question on the capacity issue. Question number one of the trial court's jury charge asked whether the District materially breached the Contract by, among other things, "failing to have adequate capacity," and the jury answered, "Yes." Jury question number three asked what sum of money, if any, would fairly and reasonably compensate The Colony for its damages that were caused by the District's failure to comply with the Contract. Although The Colony labels its argument as a "failure of consideration" instead of a "breach of contract," its argument is the same: the District failed to meet its obligation to provide capacity to The Colony as required by the Contract. Because the trial court did not grant the District summary judgment on this issue, which is an issue that was ultimately submitted to the jury, it is not appropriate for us to determine in the summary judgment context whether a genuine issue of material fact exists thereon.

61

### 3.	Mutual Mistake of Fact

Frisco and the District moved for summary judgment on The Colony's claim seeking a declaration that it is entitled to rescind the Contract due to a mutual mistake of fact.  The District sought summary judgment on this claim on traditional grounds only.

A mutual mistake of fact occurs when the parties to an agreement have a common intention, but their written agreement erroneously reflects that intention due to a mistake by both parties in writing the agreement. *Newsom v. Starkey*, 541 S.W.2d 468, 472 (Tex. Civ. App.—Dallas 1976, writ ref'd n.r.e.).  The elements of mutual mistake are thus (1) a mistake of fact, (2) held mutually by the parties, and (3) which materially affects the agreed-upon exchange. *Barker*, 105 S.W.3d 75 at 84.  The doctrine of mutual mistake must not routinely be available to avoid the results of an unhappy bargain. *Williams v. Glash*, 789 S.W.2d 261, 265 (Tex. 1990).  Parties should be able to rely on the finality of freely bargained agreements. *Id*.

#### a.	Frisco

The Colony argues that it raised a genuine issue of material fact regarding mutual mistake because it interpreted the Contract to require the District to ensure access to the plant, but the other parties "appeared to have a different understanding of the [C]ontract."  The Colony directs us to Johnston's

62

deposition testimony in which he explained that he thought the District was supposed to work with The Colony in "send[ing] the lines" to the plant; to Cheatham's deposition testimony in which he opined that the District did not comply with the portion of the Contract requiring the District to use its best efforts to acquire, construct, and complete the System; and to Dillard's deposition testimony in which he opined that the District had an obligation under the Contract to obtain easements and construct pipelines.

Although The Colony submitted evidence demonstrating its own thoughts about the parties' various responsibilities under the Contract, it has offered no evidence that Frisco likewise suffered from a mistake of fact regarding any of those responsibilities. The Colony thus produced no evidence to support the mutual mistake element requiring that *both* parties be mistaken about a common intention. *See Barker*, 105 S.W.3d at 84.

Moreover, an error in predicting a future fact known to be uncertain is not the kind of mistake that will relieve a party from a contract. *Id*. The Colony left the issue of wastewater transportation to be decided at some point after the parties executed the Contract, but it did not anticipate having to negotiate the "lightning bolt" and "finger" with Frisco for pipeline or easement access. According to Johnston, "The Colony management did not see that coming." Equity does not favor The Colony for its lack of foresight.

63

We hold that The Colony failed to raise a genuine issue of material fact in response to Frisco's challenge to The Colony's request for a declaration that it is entitled to rescind the Contract because of a mutual mistake of fact and that the trial court did not err by granting Frisco's motion for summary judgment on this ground. *See* Tex. R. Civ. P. 166a(i). Accordingly, we overrule this part of The Colony's first issue.

### b. The District

The District submitted Parks's affidavit in addition to the Contract (which provides that The Colony is responsible for transporting its wastewater to the point of entry). According to Parks, the District "did not enter into an agreement with The Colony to construct its wastewater transmission lines." Moreover, "[n]o District funds were available for the construction of [T]he Colony's wastewater transportation lines because the Contract expressly placed the obligation for transporting The Colony's wastewater upon The Colony." The Colony relies on the same evidence and argument as it does in the portion of its brief addressing Frisco's motion for summary judgment on this ground. We therefore reach the same conclusion regarding the District's motion for summary judgment on this ground—The Colony produced no evidence to support the mutual mistake element requiring that *both* parties be mistaken about a common intention. *See Barker*, 105 S.W.3d at 84. We hold that The

64

Colony failed to raise a genuine issue of material fact in response to the District's challenge to The Colony's request for a declaration that it is entitled to rescind the Contract because of a mutual mistake of fact and that the trial court did not err by granting the District's motion for summary judgment on this ground. *See* Tex. R. Civ. P. 166a(c). Accordingly, we overrule this part of The Colony's second issue.

### 4. Unilateral Mistake of Fact

Frisco and the District moved for summary judgment on The Colony's claim seeking a declaration that it is entitled to rescind the Contract due to a unilateral mistake of fact. The District sought summary judgment on this claim on traditional grounds only.

A plaintiff must show the following in order to be entitled to equitable relief on the grounds of unilateral mistake: (1) the mistake is of so great a consequence that to enforce the contract as made would be unconscionable; (2) the mistake relates to a material feature of the contract; (3) the mistake must have been made regardless of the exercise of ordinary care; and (4) the parties can be placed in status quo in the equity sense; i.e., rescission must not result in prejudice to the other party except for the loss of his bargain. *James T. Taylor & Son, Inc. v. Arlington ISD*, 160 Tex. 617, 335 S.W.2d 371, 373

65

(1960); *N. Natural Gas Co. v. Chisos Joint Venture I*, 142 S.W.3d 447, 456 (Tex. App.—El Paso 2004, no pet.).

The Colony argues that it raised a fact issue as to whether Frisco's conduct was unconscionable and that the evidence was undisputed that The Colony paid over $12 million to upgrade its own treatment plant. Although it directs us to Johnston's testimony in which he opines that the expenditure of $878,000 under the Contract was not a "good expenditure" and to Cheatham's testimony in which he discusses amounts paid by The Colony under the Contract, The Colony's expenditure of between $12 and $13 million to modify its plant, and other miscellaneous issues, The Colony does not set forth any argument or discussion regarding any evidence of how the mistake was made despite the exercise of ordinary care or whether the parties can be placed in the status quo from an equitable standpoint (prejudice). *See James T. Taylor & Son, Inc.*, 335 S.W.2d at 373. Because The Colony failed to raise a genuine issue of material fact in support of two essential elements of its unilateral mistake theory, we hold that The Colony failed to raise a genuine issue of material fact in response to Frisco's challenge to The Colony's request for a declaration that it is entitled to rescind the Contract because of a unilateral mistake of fact and that the trial court did not err by granting Frisco's motion

66

for summary judgment on this ground. *See* Tex. R. Civ. P. 166a(i). Accordingly, we overrule this part of The Colony's first issue.

The District challenged the unilateral mistake element requiring that rescission not result in prejudice to the other party except for the loss of his or its bargain. Johnston testified that The Colony wants the return of the approximately $878,000 that it paid to the District even though he admitted that the District had utilized all money paid to it to maintain the plant. According to Parks, however, because the plant was expanded for use by The Colony and Frisco, the sole source of funds to repay the bond debt and to pay for the operation and maintenance of the System comes from funds generated under the Contract from The Colony and Frisco. Thus, the District "cannot utilize funds from other projects to fund construction or operating costs" of the plant and, consequently, would not—in the equity sense—be returned to the status quo if the Contract is rescinded.

The District having met its summary judgment burden under the challenged element of prejudice resulting from rescission, The Colony relies on the same evidence and argument as it does in the portion of its brief addressing Frisco's motion for summary judgment on the ground of unilateral mistake. The Colony thus does not set forth any argument or discussion regarding any evidence that rescission would not result in prejudice to the District. *See*

67

*James T. Taylor & Son, Inc.*, 335 S.W.2d at 373.  We hold that The Colony failed to raise a genuine issue of material fact in response to the District's challenge to The Colony's request for a declaration that it is entitled to rescind the Contract because of a unilateral mistake of fact and that the trial court did not err by granting the District's motion for summary judgment on this ground. *See* Tex. R. Civ. P. 166a(c).  Accordingly, we overrule this part of The Colony's second issue.

### 5. Repudiation

Frisco and the District moved for summary judgment on The Colony's claim seeking a declaration that it is entitled to rescind the Contract because Frisco and the District repudiated—or expressed an intent not to perform their respective obligations under—the Contract.  Both Frisco and the District moved for summary judgment on no evidence grounds.

Repudiation consists of words or actions by a contracting party that indicate he is not going to perform his contract in the future.  *Jenkins v. Jenkins*, 991 S.W.2d 440, 447 (Tex. App.—Fort Worth 1999, pet. denied); *Group Life & Health Ins. Co. v. Turner*, 620 S.W.2d 670, 673 (Tex. Civ. App.—Dallas 1981, no writ).  It is conduct that shows a fixed intention to abandon, renounce, and refuse to perform the contract.  *Jenkins*, 991 S.W.2d at 447.  In order for a statement to be deemed repudiation, "a party's language

68

must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform." *El Paso Natural Gas Co. v. Lea Partners, L.P.*, No. 08-01-00310-CV, 2003 WL 21940729, at *5 (Tex. App.—El Paso Aug. 14, 2003, pet. denied) (mem. op.) (citing Restatement (Second) of Contracts § 250 cmt. b (1979)).

The Colony argues only that it raised a genuine issue of material fact that Frisco repudiated the Contract because "Frisco simply would not allow [The Colony] access to the Plant without [The Colony's] entering into a disannexation and boundary adjustment agreement." Frisco's desire to negotiate for The Colony's disannexation of the real property known as the "lightning bolt" and the "finger," however, does not raise a genuine issue of material fact that Frisco demonstrated by words or actions either an intent not to perform or an inability to perform its obligations under the Contract. We have reviewed all of The Colony's summary judgment evidence in response to Frisco's motion for summary judgment. None of it raises a genuine issue of material fact that Frisco showed a fixed intention to abandon, renounce, and refuse to perform any of its obligations under the Contract. *See Jenkins*, 991 S.W.2d at 447. We hold that The Colony failed to raise a genuine issue of material fact in response to Frisco's challenge to The Colony's request for a declaration that it is entitled to rescind the Contract because of Frisco's repudiation of the Contract and that the trial

court did not err by granting Frisco's motion for summary judgment on this ground. *See* Tex. R. Civ. P. 166a(i). Accordingly, we overrule this part of The Colony's first issue.

In terms of the District, The Colony relies on the same evidence and argument as it does in the portion of its brief addressing Frisco's motion for summary judgment on this ground. We hold that The Colony failed to raise a genuine issue of material fact in response to the District's challenge to The Colony's request for a declaration that it is entitled to rescind the Contract because of the District's repudiation of the Contract and that the trial court did not err by granting the District's motion for summary judgment on this ground. *See id*. Accordingly, we overrule this part of The Colony's second issue.

In addition to The Colony's claim seeking a declaration that it is entitled to rescind the Contract because of Frisco's and the District's alleged repudiation of the Contract, The Colony alleged in its third amended original petition that it was seeking "a declaration that its liability to the Defendants under the contract, if any, has been released and extinguished by the Defendants' failure to perform." To the extent that there is any distinction between this repudiation claim and the repudiation claim that we analyzed in the context of rescission immediately above, and to the extent The Colony seeks to appeal the trial court's grant of summary judgment on this claim, The Colony waived any

70

complaint regarding this rescission claim because it failed to set forth any argument or analysis of this matter in its brief*. See* Tex. R. App. P. 38.1(h).

### 6.    Unjust Enrichment

In addition to the unjust enrichment claim addressed above, The Colony alleged that it was entitled to rescind the Contract in order to avoid the unjust enrichment of Frisco or the District.  Frisco and the District successfully moved for summary judgment on this ground.

With the exception that The Colony made this unjust enrichment claim in the context of its rescission allegations, we decipher no distinction between this unjust enrichment claim and The Colony's other unjust enrichment claim analyzed above.  Nor does The Colony argue that there is a difference between the two.  Applying the unjust enrichment principles articulated above, we hold that The Colony failed to raise a genuine issue of material fact in response to Frisco's and the District's challenges to The Colony's request for a declaration that it its entitled to rescind the Contract due to the unjust enrichment of Frisco or the District and that the trial court did not err by granting Frisco's and the District's motions for summary judgment on this ground.  Accordingly, we overrule this part of The Colony's first and second issues.  The trial court did not

71

err by granting Frisco and the District summary judgment on The Colony's claims seeking a declaration that it is entitled to rescind the Contract.[9]

### E. Promissory Estoppel

Frisco and the District successfully moved for summary judgment on The Colony's claim that it is "entitled to relief pursuant to a cause of action for promissory estoppel against Defendants." The Colony sets forth zero argument or evidence in its brief challenging the trial court's grant of summary judgment in favor of Frisco and the District on this ground. Thus, to the extent The Colony intends to challenge this portion of the trial court's orders granting Frisco and the District summary judgment on this ground, its complaint is waived. *See* Tex. R. App. P. 38.1(h). We overrule this part of The Colony's first and second issues.

### F. Breach of Contract

The essential elements of a breach of contract claim are the existence of a valid contract, performance or tendered performance by the plaintiff, breach of the contract by the defendant, and damages sustained as a result of the breach. *See Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351

---

[9] Thus, although we held above that the trial court erred by granting Frisco summary judgment on its ratification affirmative defense, Frisco was nonetheless entitled to summary judgment on The Colony's rescission claims.

72

(Tex. App.—Houston [1st Dist.] 2001, no pet.). The normal measure of damages in a breach of contract case is the benefit of the bargain, the purpose of which is to restore the injured party to the economic position it would have been in had the contract been performed. *Mays v. Pierce*, 203 S.W.3d 564, 577 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

### 1. The Colony's Claims

The Colony sued both Frisco and the District for breach of contract. The trial court granted Frisco's motion for summary judgment on The Colony's breach of contract claim, and with the exception of "The Colony's cause of action that [the District] breached its obligation to provide wastewater treatment services to The Colony at the 'Point of Entry' to the District's System," the trial court granted the District's motion for summary judgment on The Colony's breach of contract claim.

### a. Frisco

The Colony does not set forth any argument or evidence in its brief challenging the trial court's grant of summary judgment in favor of Frisco on The Colony's breach of contract claim. To the extent The Colony intends to challenge this portion of the trial court's order granting Frisco summary judgment on The Colony's breach of contract claim, its complaint is waived. *See* Tex. R. App. P. 38.1(h). We overrule this part of The Colony's first issue.

73

### b. The District

In its no evidence motion for summary judgment challenging The Colony's breach of contract claim, the District specifically challenged the element requiring The Colony to prove that the District breached the Contract. The Colony argues that its summary judgment evidence raised a genuine issue of material fact that the District breached the Contract in the following two ways: (1) the District breached the Contract for failing to use its best efforts to design, acquire, and construct the System and (2) the District breached the Contract for failure to use its best efforts to implement the "red book." The Colony's argument is centered on section 2.01 of the Contract, which states, "In order to provide services for receiving, transporting, treating, and disposing of Wastewater for Participants, the District will use its best efforts to design, acquire, construct, and complete the System, as generally described in the ['red book'] . . . ."

The Colony submitted Dillard's deposition testimony in which he opined that the District failed to comply with section 2.01 of the Contract because there are no pipelines or right-of-ways for The Colony to transport its wastewater to the plant. Dillard opined that the Contract required the District to design, acquire, and construct the means for transporting The Colony's

wastewater to the plant and that The Colony was responsible only for delivering its effluent.

Cheatham opined in his deposition testimony that the District had not complied with the "best efforts" language because the pipelines set forth in the "red book" had not been constructed. He reasoned in part as follows:

> [The District's attorney]: So specifically, if you can tell, what did, in your opinion, the North Texas Municipal Water District not do regarding acquire, construct and complete the system as generally described in the engineering report?
>
> [Cheatham]: Well, to the best of my knowledge, line C, line D, line B have not been constructed and installed. . . .
>
> [The District's attorney]: So by not constructing or installing line B, C and D, that's the basis for your opinion that North Texas Municipal Water District has not done the acquiring, constructing and completing the system as generally described in the engineering report?
>
> [Cheatham]: The basis of my opinion is that they have not completed the requirements based on the fact that these lines have not been installed.

Johnston testified that he thought the District breached the Contract because it failed to work with The Colony in sending pipelines to the plant, it demonstrated a lack of cooperation with The Colony, and it was incompetent. He relied on the "red book" for his opinion that the District was supposed to assist The Colony in setting up the wastewater lines.

75

The Colony argues that the District failed to use its best efforts "to implement the concepts contained in the ['red book']." It contends that the District could have allowed The Colony to construct its own pipelines had the District acquired title to existing right-of-way and easement facilities, that the District was "unwilling to take action contrary to Frisco's interests" because "Frisco sits on [the District's] Board of Directors and is a large customer," and that Lisa McCurley, a specialist in wastewater discharge permits, concluded that "permit capacity applications should have been submitted about five years in advance of the anticipated tie-in date" and that the District had consequently failed to employ an adequate permit strategy because it "had not entered the permitting process" as of October 2006.

Utilizing the same rules on contract construction detailed above, The Colony did not raise a genuine issue of material fact that the District breached the Contract for failing to use its best efforts to design, acquire, and construct the System or to implement the "red book" because a fair reading of the entire Contract—not just parts of it read in isolation—does not support any of the contentions relied upon by The Colony to raise a fact issue. Specifically, the Contract defines "System" as "all of the District's facilities acquired, constructed, used, or operated by the District for receiving, transporting, treating, and disposing of Wastewater of and for Participants." Although it uses

76

the word "transporting," the remainder of the very same sentence unambiguously clarifies that the definition "exclud[es] any facilities . . . required to transport Wastewater to any Point of Entry of the District's System." This means that any time the term "System" is used in the Contract, unless otherwise indicated, the term is *not* meant to include facilities required to transport wastewater.

The definition of "System" is further limited in the second full sentence of the definition to those facilities "which are acquired, constructed, used, or operated *by the District* to provide service to Participants pursuant to this Contract." [Emphasis added.] Consistent with this provision, nowhere does the Contract require or provide that the District is to operate facilities used to transport wastewater.

Further limiting the meaning and scope of the term "System" is section 8.01 of the Contract, which provides that "[t]he System shall initially consist of *the Plant*." [Emphasis added.] The Contract provides that the term "Plant" refers to the "Stewart Creek West Plant," which "the District currently operates." There is no evidence to indicate that the term "Plant" has taken on

77

any additional meaning since the execution of the Contract to include pipelines for wastewater transportation.[10]

As for the "red book," although the initial portion of the Contract generally states that "the parties hereto wish to further implement the ['red book']," the Contract goes on to specifically clarify how the parties—notwithstanding the "red book"—intended to treat the issue of wastewater transportation as part of its "implementation" of the "red book."  Section 3.03 expressly provides that it is the sole responsibility of The Colony and Frisco to transport, or cause to be transported, its wastewater to the point of entry.  The Contract does not expressly incorporate the "red book," nor is the "red book" attached to the Contract as an exhibit.[11]

The Colony's arguments that the District failed to use its best efforts to design, acquire, and construct the "System" and to implement the "red book" are contrary to long-established rules of contract construction requiring that we

---

[10] Although the System "initially" consists of the plant, section 2.01 provides that the District "shall have the right to provide single plants, multiplants, or combine two or more plants, and to use or discontinue the use of any facility of the System as the District deems necessary."

[11] There are two exhibits to the Contract.  Exhibit "A" is designated, "Points of Entry," and Exhibit "B" is designated, "All wastewater treatment facilities, structures, apparatus, equipment, and devices located on the following described property as of the date of the Contract."

78

ascertain the true intent of the parties by examining and considering the entire Contract to give effect to *all* of the Contract's provisions, that we presume the parties to the Contract intended every clause to have some effect, and that a specific provision controls over a general provision. *See Coker*, 650 S.W.2d at 393; *Heritage Res., Inc.*, 939 S.W.2d at 121. The Colony's evidence relating to the District's failure to assist with the acquisition of easements or to construct or assist with the construction of pipelines is thus based upon an improperly broad—and ultimately unreasonable—interpretation, or assumption, of the relevant portions of the Contract. For these reasons, its arguments must fail.

We hold that The Colony failed to raise a genuine issue of material fact in response to the District's challenge to The Colony's breach of contract claim and that the trial court did not err by granting the District's motion for summary judgment on this ground. *See* Tex. R. Civ. P. 166a(i). Accordingly, we overrule this part of The Colony's second issue.

### 2. Frisco's Counterclaim

With the exception of damages, the trial court granted Frisco's motion for summary judgment on Frisco's breach of contract counterclaim. The Colony challenges the trial court's grant of summary judgment in favor of Frisco on the breach of contract counterclaim.

79

The Contract is signed by the District's President, Board of Directors, Frisco's mayor, The Colony's mayor, and three witnesses. Section 11.01 of the Contract provides that it "shall become effective as of the date of execution hereof." The Contract is dated May 28, 1998. Section 11.02 provides that the Contract "shall continue in force from the effective date hereof at least until all bonds . . . shall have been paid in full; and shall also remain in force thereafter throughout the useful life of the System."

The Contract is clear on the parties' respective obligations. It provides that "[i]n consideration of the payments to be made under its respective contract with the District," The Colony and Frisco shall have the right to discharge wastewater into the System. Regarding financing, the Contract provides that the District will issue bonds to provide for the system. Section 5.03 of the Contract states that "[f]or services to be rendered to each Participant by the District under this Contract . . ., each Participant has agreed to pay, at the time and in the manner hereinafter provided, its proportionate share of the Annual Requirement . . . ." Section 5.02 provides that the Annual Requirement shall not be less than an amount sufficient to pay the "Operation and Maintenance Component" and the "Bond Service Component," which includes in part the redemption premium, if any, and interest on, the bonds issued to fund the expansion of the plant. Section 5.03(h) provides that The Colony and Frisco are

80

"obligated unconditionally" to make the "Bond Service Component" payment "regardless of whether or not the District actually provides such facilities and services, or whether or not any Participant actually receives or uses such facilities and services . . . ." Payments made by The Colony and Frisco to the District are the "*only* source available to the District to provide the Annual Requirement." [Emphasis added.] Sections 5.03(d) and 5.03(d)(v) provide that "[e]ach Participant's Annual Payment also shall be adjusted and redetermined for the balance of any applicable Fiscal Year, consistent with the provisions of this contract, . . . at any time during any Fiscal Year if" "[i]t appears to the District that for any other reason it will not receive the full amount of the Annual Requirement unless such adjustment or redetermination are made."

Johnston agreed it was The Colony's understanding that the District was going to issue bonds to finance the construction of the plant. He also agreed that it was The Colony's understanding that it was The Colony's and Frisco's obligation to repay the principal and interest on the bonds and the maintenance and operation of the facility. Johnston additionally testified about the percentages of capacity that were allocated to The Colony at the plant between 1999 and 2003–2004. He agreed that The Colony understood that it would still have to pay its percentage share if it did not access the plant.

The Colony eventually quit making payments to the District even though its payments under the Contract are "unconditional." Parks opined that The Colony had breached the Contract because it failed to continue making payments and that The Colony owes money for its share of the payments required under the Contract. Under the tri-party Contract, The Colony and Frisco are the only two participants. The Colony's and Frisco's payments are thus the only source of money available to pay the bond debt and the operation and maintenance of the plant. If a participating city failed to make a payment under the Contract, in this case The Colony, then the other participant, in this case Frisco, had to make up the difference. With the exception of damages, we hold that Frisco met its initial summary judgment burden to show that The Colony materially breached the Contract. *See Kalama Int'l*, 51 S.W.3d 345, 351 (setting forth elements of breach of contract claim).

The Colony argues that the trial court erred by granting Frisco's motion for summary judgment on its counterclaim for the following reason: "The Colony submitted extensive summary judgment evidence that raised factual disputes regarding the parties' respective obligations and rights. Because the facts were disputed, the trial court erroneously granted summary judgment . . . ." It goes on to state a number of breach of contract rules and that its mayor and assistant city manager "understood that The Colony would bear the cost of transporting

82

wastewater, and The Colony was always prepared to pay those costs." It continues, "The impediments were access to the plant . . . and capacity at the plant . . . ." The Colony thus relies on the other arguments and evidence addressed above to demonstrate the existence of a fact issue.

Having reviewed all of The Colony's evidence, we hold that The Colony failed to raise a genuine issue of material fact in response to Frisco's motion for summary judgment on its breach of contract counterclaim and that the trial court did not err by granting Frisco's motion for summary judgment on its breach of contract counterclaim. *See* Tex. R. Civ. P. 166a(a), (c); *Jones*, 710 S.W.2d at 60. We overrule the remainder of The Colony's first issue.

## IV. ADDITIONAL ERRORS AND HARM

In its third issue, The Colony argues that the trial court's rulings on the summary judgments taken together with three other erroneous trial court rulings caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1). The errors that The Colony complains of relate to the trial court's refusal to grant trial amendments, jury charge error, and denial of The Colony's post trial motion to enter judgment rescinding the Contract.

### A. Trial Amendments

The Colony filed its motion for leave to file trial amendments on November 20, 2006, the final day of trial. It requested leave pursuant to rule of civil

83

procedure 67 to file its second supplemental petition as a trial amendment, arguing that it had produced unobjected-to evidence at trial in support of the following legal theories: excuse of breach due to prior material breach by the District, novation, offer of new terms, waiver of nonpayment, failure of consideration, estoppel, ratification, and failure to mitigate damages. The Colony further requested leave pursuant to rule of civil procedure 66 to file its third supplemental petition as a trial amendment, requesting that the trial court vacate its prior summary judgment orders and reasserting legal theories that were disposed of on summary judgment and asserting other theories brought up outside the presence of the jury. The trial court denied The Colony's motion for leave to file the trial amendments.

Rule 67 provides in part, "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Tex. R. Civ. P. 67. The rule of implied consent is only intended to apply to exceptional circumstances where it clearly appears from the record that the parties tried the unpleaded issue by consent. *White v. Sullins*, 917 S.W.2d 158, 160 (Tex. App.—Beaumont 1996, writ denied). To decide whether an issue was tried by consent, we review the record "not for evidence of the issue, but rather for evidence of trial of the issue." *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*,

184 S.W.3d 760, 771 (Tex. App.—Dallas 2005, pet. denied). A party's unpleaded issue may be deemed tried by consent when evidence on the issue is developed under circumstances indicating both parties understood the issue was in the case, and the other party failed to make an appropriate complaint. *Id*. However, trial by consent is inapplicable when evidence relevant to an unpleaded matter is also relevant to a pleaded issue; in that case, admission of the evidence would not be calculated to elicit an objection, and its admission ordinarily would not demonstrate a "clear intent" on the part of all parties to try the unpleaded issue. *Id*. The trial court has great discretion in deciding whether to permit a trial amendment. *See Hardin v. Hardin*, 597 S.W.2d 347, 349–50 (Tex. 1980).

Here, the record does not indicate that both parties understood that the legal theories of excuse of breach due to prior material breach, novation, offer of new terms, waiver of nonpayment, failure of consideration, estoppel, ratification, and failure to mitigate damages were to be tried. Rather, Frisco or the District asserted repeated objections to The Colony's attempt to elicit testimony regarding issues previously resolved by the trial court's summary judgment orders or other irrelevant issues. Moreover, to the extent there is any evidence of the above theories, that evidence is also relevant to the contractual matters actually at issue in the trial. The record does not demonstrate the

85

parties tried the above theories by consent. *See Case Corp.*, 184 S.W.3d at 771. Accordingly, we hold that the trial court did not abuse its discretion by denying this part of The Colony's motion for leave to file trial amendments.

Rule 66 governs amendments during trial. Tex. R. Civ. P. 66. Under rule 66, a trial court is required to freely grant the request unless the opposing party presents evidence of surprise or prejudice or the amendment asserts a new cause of action or defense, and thus is prejudicial on its face. *State Bar of Tex. v. Kilpatrick*, 874 S.W.2d 656, 658 (Tex.), *cert. denied*, 512 U.S. 1236 (1994). An amendment is prejudicial on its face if it asserts a new substantive matter that reshapes the nature of the trial itself, the opposing party could not have anticipated the amendment in light of the prior development of the case, and the opposing party's presentation of the case would be detrimentally affected. *Dunnagan v. Watson*, 204 S.W.3d 30, 38 (Tex. App.—Fort Worth 2005, pet. denied).

The Colony's third amended supplemental petition alleged that Frisco and the District committed statutory fraud and negligent misrepresentation; that Frisco "intentionally interfered with the District's and Plaintiff's attempts to perform under the contract, which interference was a proximate cause of Plaintiff's actual damage"; that Frisco's "city manager acted with apparent authority in interfering with the District's and Plaintiff's attempts to perform

86

under the [C]ontract"; that Frisco and the District engaged in a joint enterprise to prevent The Colony from gaining access to the wastewater treatment plant; and that Frisco and the District engaged in a civil conspiracy. None of these new causes of action were pleaded in The Colony's third amended petition, and, consequently, none of the theories were at issue when the trial court ruled on Frisco's and the District's motions for summary judgment. The issues remaining to be resolved at trial were clear, and Frisco's and the District's presentation of their cases would have been detrimentally affected had the trial court granted the amendment because the new theories would have reshaped the nature of the trial. *See Dunnagan*, 204 S.W.3d at 38. We hold that the trial court did not abuse its discretion by denying this part of The Colony's motion for leave to file trial amendments. And we hold that the trial court's ruling denying The Colony's motion for leave to file trial amendments did not prevent The Colony from properly presenting its case to this court. *See* Tex. R. App. P. 44.1(a)(2) (stating that no judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of probably prevented the appellant from properly presenting the case to the court of appeals). To the extent The Colony intends to raise any other arguments under this issue that we have not addressed immediately above, they are waived. *See* Tex. R. App. P. 38.1(h) (stating that appellate brief

87

must contain a clear and concise argument for the contentions made with appropriate citations to authorities and the record). We overrule this part of The Colony's third issue.

### B. Jury Charge

The Colony argues that the trial court's rulings on the summary judgments and trial amendments "had an improper adverse effect on the ensuing jury charge." It specifically complains of the trial court's refusal to submit a question asking whether The Colony's breach, if any, was excused.

A party is entitled to a jury question, instruction, or definition that is raised by the pleadings and evidence. Tex. R. Civ. P. 278; *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002). This is a substantive, nondiscretionary directive to trial courts, requiring them to submit requested questions to the jury if the pleadings and any evidence support them. *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992).

The trial court has broad discretion in submitting jury questions so long as the questions submitted fairly place the disputed issues before the jury. *TXI Transp. Co. v. Hughes*, 224 S.W.3d 870, 900 (Tex. App.—Fort Worth 2007, pet. granted). This broad discretion is subject only to the limitation that controlling issues of fact must be submitted to the jury. *Id.*; *see also* Tex. R. Civ. P. 278. Rule 277 also affords the trial court considerable discretion in

88

deciding what instructions are necessary and proper. *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 451–52 (Tex. 1997). Indeed, a trial court is afforded even more discretion when submitting instructions than when submitting questions. *Wal-Mart Stores, Inc. v. Middleton*, 982 S.W.2d 468, 470 (Tex. App.—San Antonio 1998, pet. denied).

The standard of review for error in the jury charge is abuse of discretion, which occurs only when the trial court acts arbitrarily, unreasonably, or without reference to guiding rules or principles. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000); *Aquamarine Operators, Inc. v. Downer*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986).

The Colony argues that the pleadings and evidence raised a fact issue regarding whether The Colony's breach of the Contract might have been excused, but the contention that a party to a contract is excused from performance because of a prior material breach by the other contracting party is an affirmative defense that must be affirmatively pleaded or it is waived. *See Compass Bank v. MFP Fin. Servs.*, 152 S.W.3d 844, 852 (Tex. App.—Dallas 2005, pet. denied); *RE/MAX of Tex., Inc. v. Katar Corp.*, 961 S.W.2d 324, 327 (Tex. App.—Houston [1st Dist.] 1997, pet. denied); *see also Hassell Constr. Co., Inc. v. Stature Commercial Co. Inc.,* 162 S.W.3d 664, 667 (Tex. App.—Houston [14th Dist.] 2005, no pet.). The Colony never pleaded that it

was discharged or excused from performing under the Contract because of a prior material breach by either Frisco or the District, nor do we find that such an affirmative defense was tried by consent. Thus, the Colony's live pleadings do not support a jury question on the defense of excuse. *See Williams*, 85 S.W.3d at 166.

Moreover, as Frisco points out, the trial court had already granted Frisco summary judgment on its counterclaim that The Colony breached the Contract. The only issue to be determined at trial—besides whether the District breached the Contract—was damages for the breach. Whether The Colony's breach was excused was beyond the scope of the issues at trial.

We hold that the trial court did not abuse its discretion by refusing to submit a question asking whether The Colony's breach, if any, was excused. We further hold that the trial court's ruling refusing to submit a jury question on excuse did not prevent The Colony from properly presenting its case to this court. *See* Tex. R. App. P. 44.1(a)(2). We overrule this part of The Colony's third issue.

### C.    Entry of Judgment

The Colony also complains of the trial court's judgment, particularly the portion of it stating that the Contract "is a valid, unambiguous and enforceable agreement." Citing "the jury findings, supporting pleadings and evidence, and

90

public policy arguments," The Colony contends that the trial court erred by refusing The Colony's request to enter judgment rescinding the Contract.

The trial court granted Frisco's and the District's motions for summary judgment on The Colony's claims for rescission. The trial court also granted in part the District's request for a declaration when it ordered in its summary judgment order granting the District's motion that the Contract "is a valid, unambiguous, enforceable agreement." We overrule this part of The Colony's third issue, and we overrule the remainder of The Colony's third issue insofar as it complains of cumulative error that prevented it from properly presenting part of its case to this court.

## V. FRISCO'S APPEAL AND THE DISTRICT'S APPEAL

In two issues, Frisco argues in its appeal that the evidence is legally and factually insufficient to support the jury's findings awarding Frisco $0.00 for both The Colony's failure to comply with the Contract and for Frisco's attorneys' fees on appeal.

In three issues, the District argues in its appeal that the trial court erred by overruling its motion to disregard the jury's finding that the District materially breached the Contract and that the evidence is legally and factually insufficient to support the jury's findings (1) that the District materially breached the

91

Contract by failing to have adequate capacity and (2) awarding the District $0.00 for attorneys' fees.

## A. Standards of Review

### 1. Legal Sufficiency

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). More than a

scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

If a party is attacking the legal sufficiency of an adverse finding on an issue on which the party had the burden of proof, the party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). We first examine the record for evidence that supports the finding, while disregarding evidence to the contrary when reasonable to do so. *Dow Chem. Co.*, 46 S.W.3d at 241; *see also City of Keller*, 168 S.W.3d at 827. If there is no evidence to support the finding, we will then examine the entire record to determine if the contrary proposition is established as a matter of law. *Dow Chem Co.*, 46 S.W.3d at 241; *Sterner*, 767 S.W.2d at 690.

"When a court of appeals disturbs the judgment of a lower tribunal, merely saying that the court has reviewed all the evidence and reaching a conclusion contrary to that of the trier of fact is not enough. Instead, the court should explain, with specificity, why it has substituted its judgment for that of the trial court." *Citizens Nat'l Bank in Waxahachie v. Scott*, 195 S.W.3d 94, 96 (Tex. 2006). When we sustain a legal sufficiency issue, it is our duty to render

93

judgment for the appellant because that is the judgment the trial court should have rendered.  *See* Tex. R. App. P. 43.3; *Vista Chevrolet, Inc. v. Lewis*, 709 S.W.2d 176, 176 (Tex. 1986).

## 2. Factual Sufficiency

An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered.  *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding.  *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.), *cert. denied*, 525 U.S. 1017 (1998).

When reviewing an issue asserting that a finding is "against the great weight and preponderance" of the evidence, we must consider and weigh all of the evidence and set aside the finding only if the evidence is so weak or the finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust.  *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

**B.      Frisco's Challenge to the Jury's Finding of $0.00 Damages**

Frisco argues that it established as a matter of law that it was damaged in the amount of $642,863.98 for The Colony's breach of the Contract. Frisco had the burden of proof on this issue at trial.

The jury has discretion to award damages within the range of evidence presented at trial. *Dunnagan*, 204 S.W.3d at 47. A jury may not, however, arbitrarily assess an amount neither authorized nor supported by the evidence presented at trial. *Id*.

There is no evidence that Frisco's damages for The Colony's failure to comply with the Contract are $0.00. We now examine the record to determine if a particular value of Frisco's damages was established as a matter of law. *See Dow Chem Co.*, 46 S.W.3d at 241; *Sterner*, 767 S.W.2d at 690; *see also Kitchen v. Frusher*, 181 S.W.3d 467, 473 (Tex. App.—Fort Worth 2005, no pet.).

Judd Sanderson is the District's director of finance. He testified that the District issued approximately $7 million in bonds in 1998 to fund the expansion and construction of the plant. The issuance of the bonds, which are to be repaid over twenty years, thus created debt. Under the terms of the Contract, The Colony and Frisco are required to make debt service payments that repay the bond obligations. There are no other sources of funds that the District has

95

to repay the bonds issued to finance the plant's expansion because The Colony and Frisco are the only two participants under the Contract.

Sanderson testified that The Colony quit making payments to the District under the Contract around October 2002. Cheatham acknowledged that The Colony did not make contractual payments for the fiscal years 2004, 2005, 2006, and 2007.[12] Frisco funded The Colony's share of the payments thereafter. Through November 16, 2006, Frisco had paid $642,863.98 on The Colony's behalf. The trial court admitted into evidence checks reflecting Frisco's payments to the District.

The Colony cross-examined Sanderson about an $11,000 underpayment by The Colony in 2002 that Frisco ended up "picking up" for The Colony. Sanderson testified that he did not personally contact someone at The Colony to discuss the underpayment but that someone at the District did. The Colony also questioned Sanderson whether notice was given to The Colony about the remaining underpayments under the Contract, and he concluded that notice was sent to The Colony when it stopped making payments. The Colony's cross-examination of Sanderson thus focused only on the issue of notice.

---

[12] Cheatham testified that it "may be true" that The Colony did not make contractual payments for the fiscal years 2002 and 2003.

The Colony contends that the damages evidence is disputed and controverted because "Frisco refused to grant easements for pipeline construction or permission to tap into existing pipelines to the Plant," "The Colony was deprived of the entire benefit of the agreement," "The Colony's expert witness testified that [the District] had failed to provide adequate capacity to treat its wastewater," "Frisco refused to cooperate and impliedly instructed [the District] not to cooperate either," and The Colony was "forced to spend over twelve million dollars in upgrading and expanding its existing treatment plant." The Colony also directs us to Purefoy's testimony in which he acknowledged that "the jurors should review the documents 'to determine whether or not the City of The Colony owes you any money'" and "conceded on the stand that the jury may need to review every one of the invoices and determine how the payments should be allocated." But the trial court's order granting Frisco's motion for summary judgment on its counterclaim makes clear that the sole issue held over for trial on the counterclaim was damages and attorneys' fees. This evidence either re-asserts issues and evidence relevant to matters resolved by the trial court's grant of summary judgment on The Colony's claims (pipeline and easement issues, consideration, "refusal" to cooperate) or points out evidence relevant only to The Colony's claim that the District breached the Contract (i.e., lack of capacity and $12 to $13 million spent on its

97

own treatment plant). None of it is evidence controverting or disputing Sanderson's testimony that Frisco paid $642,863.98 under the Contract on behalf of The Colony.

By its reliance on the evidence above, The Colony seems to be arguing that it should not have to pay monies owed under the Contract because of the actions of Frisco and the District. It thus contends that we "should presume that the jurors reasonably believed that The Colony's obligation to perform was excused due to a prior material breach of the contract." The Colony argues that a reasonable juror could conclude "that The Colony was deprived of the entire benefit it reasonably expected under the agreement," "that The Colony was never compensated for that deprivation," and "that neither Frisco nor [the District] was deprived of any benefits they anticipated under the [C]ontract." As mentioned above, the contention that a party to a contract is excused from performance because of a prior material breach by the other contracting party is an affirmative defense that must be affirmatively pleaded. *Compass Bank*, 152 S.W.3d at 852. The Colony never pleaded that it was discharged or excused from performing under the Contract because of a prior material breach by either Frisco or the District, nor do we find that such an affirmative defense was tried by consent.

We have examined the entire record.  Sanderson's testimony was clear, direct, and uncontroverted.  The jury's $0.00 damages finding was arbitrary. We hold that Frisco established as a matter of law that it was damaged in the amount of $642,863.98 for The Colony's failure to comply with the Contract. The evidence is thus legally insufficient to support the jury's finding awarding $0.00 for The Colony's failure to comply with the Contract.  *See Dow Chem Co.*, 46 S.W.3d at 241; *Sterner*, 767 S.W.2d at 690; *see also Howell Pipeline Tex., Inc. v. ExxonMobile Pipeline Co.*, No. 14-02-00387-CV, 2003 WL 22436919, at *2 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("While it is generally within the province of jurors to set damages, they cannot ignore the undisputed facts and arbitrarily deny any recovery.").  Accordingly, we sustain Frisco's first issue.

## C.    District's Challenge to Breach-Capacity Finding

In its second issue, the District argues that the evidence is legally and factually insufficient to support the jury's finding to question one, part (B) that the District materially breached the Contract by failing to have adequate capacity.[13]  The Colony had the burden of proof on this issue at trial.

---

[13] The District does not argue that the trial court erred by submitting question one, part (B).

Parks testified that the plant had a capacity of 1.5 million gallons per day when the Contract was executed in May 1998. Prior to the Contract's execution, the District had filed for a permit to expand the plant's capacity to five million gallons per day. The plant was subsequently expanded to a capacity of five million gallons per day sometime in 2001 at a cost of approximately $7 million. The Colony did not have a wastewater pipeline that connected to the plant when the Contract was executed.

The Colony was "having trouble" with its wastewater treatment plant sometime in 2003, and they were "looking at options, multiple options" to address these issues. The Colony and the District had meetings in 2003 regarding wastewater transportation and flow numbers.

Frisco's average flow at the plant in 2003 was between 3.1 and 3.3 million gallons per day. Parks sent a letter to Cheatham in April 2003, stating that they had met on April 3, 2003, "to discuss future wastewater service to The Colony." Parks indicated in the letter that The Colony's flow to the plant would have to be staged because there was insufficient capacity at the plant "to suddenly shut down The Colony's wastewater treatment plant and transport all of that flow to the Stewart Creek West Regional Plant."

An August 2003 administrative memorandum prepared by Parks stated that at the time, The Colony's treatment plant had a flow of 2.3 million gallons

100

per day. According to Parks, "If The Colony's treatment plant was closed and all of the flow was transferred to the Stewart Creek West Regional WWTP [the plant], it would put the regional plant over its capacity." Parks stated that The Colony had commissioned an engineering study that recommended The Colony construct facilities to transfer a portion of flow to the plant, and "*[w]hen there is adequate treatment capacity at the [plant]*, The Colony plans to close [its] treatment plant and transfer all" of its wastewater flow to the plant. [Emphasis added.] A September 2003 District administrative memorandum states that The Colony has "asked [the District] to consider treating all The Colony's flow at the Stewart Creek West Plant."

The Contract also requires the District to give notice when it has the capability to receive wastewater in the System. Parks did not recall the District's sending notice to The Colony that it had the capability to receive wastewater at the point of entry.

Parks testified about the "75/90" rule, which provides "that when you reach 75 percent of the capacity of a plant, you need to begin considering expansion of the plant or ways to reduce flow to that plant." According to Parks, the plant was at 75 percent capacity in 2003, 2004, and 2005. He testified that the District was contemplating an expansion of the plant in 2003, which would take between two and three years to complete, but the decision

101

was made to not expand the plant. Parks agreed, however, that the plant would have to be expanded if The Colony was going to transfer all of its wastewater (2.1 or 2.3 million gallons per day) to the plant.

Dobbs, a District planning officer, testified that he had numerous meetings with The Colony, that The Colony sent him several different flow numbers between 2001 and 2004, and that The Colony expressed its desire to connect to the plant.

The District argues that the evidence is insufficient to support the jury's finding regarding insufficient capacity because it was impossible for The Colony to transport all of its wastewater to the plant at once. According to the District, because it would take time for The Colony to make preparations for the transportation of its wastewater to the plant, the District would have had time itself to make preparations for treating The Colony's flows. The District directs us to the portion of the Contract that allows the District to use other facilities to treat wastewater and evidence that the District was constructing the Panther Creek wastewater treatment facility, which was supposed to be "online" sometime in 2007 or 2008 and would have reduced the capacity being used at the plant.

Applying the applicable standards of review, we hold that the evidence is legally and factually sufficient to support the jury's finding to question one, part

(B) that the District materially breached the contract for failing to have adequate capacity. *See Martinez*, 977 S.W.2d at 334; *Garza*, 395 S.W.2d at 823. We overrule the District's second issue.

### D. Immaterial Finding

In its first issue, the District argues that the trial court erred by overruling its motion to disregard jury findings and for judgment notwithstanding the verdict. Specifically, it argues that the jury's finding to question one, part (B) that the District breached the Contract for failing to have adequate capacity was rendered immaterial by its finding in question two that the District's breach was excused by The Colony's previous material breach of the Contract.

A trial court may disregard a jury's answer to a question in the charge only when the answer has no support in evidence or the question is immaterial. Tex. R. Civ. P. 301; *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994). A jury question is immaterial when it should not have been submitted, it calls for a finding beyond the province of the jury, such as a question of law, or when it was properly submitted but has been rendered immaterial by other findings. *Se. Pipeline Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999). The District relies on the third ground.

The District's sole argument is based on an analogization between the facts of this case and those in *Hooker v. Nguyen*, No. 14-04-00238-CV, 2005

WL 2675018, at *8–11 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (mem. op.). In that "difficult and convoluted" case, Hooker contracted with Nguyen for Nguyen to perform construction work on a salon. *Id*. at *1. Both parties eventually sued each other for breach of contract, among other things. *Id*. at *3. The jury found in part that both Hooker and Nguyen failed to comply with the agreement. *Id*. The judgment awarded Nguyen actual and exemplary damages and found that Hooker failed to make prompt payment and that the failure to make prompt payment was unexcused. *Id*.

Hooker argued in part on appeal that the jury's finding that he failed to comply with the contract should have been disregarded as immaterial because he "proved conclusively that Nguyen failed to comply with the contract before Hooker refused to make the final payment that would have been due under the contract," which excused Hooker's performance. *Id*. at *8. Relying on the "well-settled principle in Texas law that when a party to a bilateral contract commits a material breach of that contract, the other party is discharged or excused from further performance," the court agreed with Hooker and held that the trial court should have disregarded the jury's answers to the questions regarding Hooker's breach because the evidence demonstrated that Nguyen committed a material breach as a matter of law, and Hooker was thereafter discharged from his duties under the contract. *Id*. at *8–11; *see also Mustang*

*Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004) (discussing "well-settled principle").

*Hooker* is distinguishable from the facts of this case because the trial court declared and ordered in its final judgment "that the Stewart Creek West Regional Wastewater System Contract entered into May 28, 1998 by and between Plaintiff City of The Colony, Defendant NTMWD and Defendant City of Frisco is a valid, unambiguous[,] and enforceable agreement." This is a declaration rendered at the District's insistence.[14] In one of its other briefs, the District, consistent with this portion of the judgment, argues the following:

> It should be noted that the Contract has not been terminated by the District; rather, the Stewart Creek West Plant remains available for use by the Colony. Under the terms of the Contract, the Colony continues to owe monthly payments to the [District] for its share of the expenses associated with the Plant expansion.

The District further argued:

> [T]here is ample authority for the proposition that in a breach of contract suit such as the case at bar, the plaintiff (or in this case, counter-plaintiff) may either "terminate" the contract and sue the defendant for the present value of all future payments owed by the breaching defendant, or as was done in this case, continue to treat the contract as ongoing (not terminated) and sue for any later

---

[14] The trial court's order granting the District's motion for summary judgment orders that the Contract "is a valid, unambiguous, enforceable agreement." The Colony did not challenge this part of the trial court's order in this appeal.

breaches if and when that becomes necessary. . . . [The District] has chosen this route, which is its right.

Unlike in *Hooker*, in which the appellate court determined that Hooker was discharged from his duties under the contract after Nguyen's material breach, the District has expressly taken the position, according to "its right," that the Contract is ongoing, which—following its argument—means that its obligation under the Contract to provide wastewater treatment to The Colony has not been discharged. *See Hooker*, 2005 WL 2675018, at *10. The District's reliance on *Hooker* is misplaced because of this fundamental factual distinction. The District asserts no other argument in support of this issue. To the extent the District argues that the jury's finding to question one, part (B) was rendered immaterial by the jury's finding to question two, we hold that the trial court did not err by denying the District's motion to disregard jury findings and for judgment notwithstanding the verdict. *See Tichacek*, 997 S.W.2d at 172. Accordingly, we overrule the District's first issue.

### E.     Attorneys' Fees

#### 1.     Frisco's Appellate Attorneys' Fees

In its second issue, Frisco argues that it established as a matter of law during the trial that its necessary and reasonable appellate attorneys' fees totaled $70,000.00.

106

The record demonstrates that Frisco requested the award of attorneys' fees under the Uniform Declaratory Judgment Act ("UDJA"). *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (Vernon 2008). Although the jury awarded Frisco reasonable and necessary attorneys' fees for preparation of trial in the amount of $83,200.00, it awarded Frisco reasonable and necessary attorneys' fees in the amount of $0.00 for an appeal to the court of appeals, for making or responding to a "petition for writ review to the Supreme Court of Texas," and if a petition for review is granted by the supreme court. Frisco challenged the $0.00 appellate attorneys' fees award in both its motion for judgment notwithstanding the verdict and its motion for new trial.[15] Frisco affirmed at the hearing on its motion for judgment notwithstanding the verdict that it had sought to recover attorneys' fees pursuant to section 37.009.

Section 37.009 provides that "[i]n any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just." *Id*. It imposes four limitations on the trial court's discretion: the fees awarded must be reasonable and necessary, which are matters of fact, and they must be equitable and just, which are matters of law. *Bocquet v.*

---

[15] The trial court overruled the motion for judgment notwithstanding the verdict in its final judgment. The motion for new trial was overruled by operation of law. *See* Tex. R. Civ. P. 329b(c).

*Herring*, 972 S.W.2d 19, 21 (Tex. 1998); *Hunt v. Baldwin*, 68 S.W.3d 117, 135 (Tex. App.—Houston [14th Dist.] 2001, no pet.); *Hansen v. Academy Corp.*, 961 S.W.2d 329, 333 (Tex. App.—Houston [1st Dist.] 1997, writ. denied).

The award of attorneys' fees under the UDJA is not dependent upon a finding that the party prevailed. *Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 637 (Tex. 1996). Although the trial court may submit a question to the jury on the amount of reasonable and necessary attorneys' fees, it retains the authority to award or deny attorney's fees. *Hansen*, 961 S.W.2d at 333–34.

The determination to award attorneys' fees is thus solely within the sound discretion of the trial court. *Hunt*, 68 S.W.3d at 135. We can reverse the trial court's decision only if the complaining party shows a clear abuse of discretion. *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex. 1985).

In reviewing a fee award under the UDJA, we must determine whether the trial court abused its discretion by awarding fees when there was insufficient evidence that the fees were reasonable and necessary or when the award was inequitable or unjust. *Bocquet*, 972 S.W.2d at 21. Conversely, in reviewing a trial court's decision to not award attorneys' fees, we must examine whether the complaining party established not only that the fees sought are reasonable and necessary, but also that the award is equitable and just. *Abraxas Petroleum*

108

*Corp. v. Hornburg*, 20 S.W.3d 741, 763 (Tex. App.—El Paso 2000, no pet.);

*Trien v. Equity Real Estate, Inc.*, No. 08-99-00464-CV, 2001 WL 1383115, at

*5–6 (Tex. App.—El Paso Nov. 8, 2001, no pet.) (not designated for

publication); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 37.009.

Frisco argues that it proved $70,000.00 in reasonable and necessary

appellate attorneys' fees as a matter of law, but it does not set forth any

argument or analysis in its briefing that an award of $0.00 for appellate

attorneys' fees is inequitable or unjust.[16] *See Karen Corp. v. Burlington N. &*

*Santa Fe Ry. Co.*, 107 S.W.3d 118, 126–27 (Tex. App.—Fort Worth 2003, pet.

denied) (considering sufficiency of evidence and justness of attorneys' fees

awarded under section 37.009); *Heritage Res., Inc. v. Hill*, 104 S.W.3d 612,

619–22 (Tex. App.—El Paso 2003, no pet.) (same). This is an issue addressed

---

[16] Frisco's sole argument in its opening brief is that the evidence at trial
conclusively established that its necessary and reasonable attorneys' fees on
appeal total $70,000.00. It argues for the first time in its reply brief that "the
trial court erred when the court awarded Frisco all of its trial fees but then
completely denied Frisco's appellate fees." To the extent this argument has
any bearing on this issue, the argument has not been preserved for appellate
review. *See Gray v. Woodville Health Care Ctr.*, 225 S.W.3d 613, 620 (Tex.
App.—El Paso 2006, pet. denied) (reasoning that issue raised for the first time
in reply brief not preserved for appeal); *Howell v. Tex. Workers' Comp.
Comm'n*, 143 S.W.3d 416, 439 (Tex. App.—Austin 2004, pet. denied)
(reasoning that the rules of appellate procedure do not allow an appellant to
include in a reply brief a new issue not raised in its original brief); *see also* Tex.
R. App. P. 38.3.

to the trial court's sole discretion. Considering the record, the trial court may have concluded that it would not have been equitable or just to award Frisco any reasonable and necessary appellate attorneys' fees, as it is permitted to do. *See Bocquet*, 972 S.W.2d at 21 ("Unreasonable fees cannot be awarded, even if the court believed them just, but the court may conclude that it is not equitable or just to award even reasonable and necessary fees."). Consequently, Frisco has failed to demonstrate that the trial court clearly abused its discretion by not awarding Frisco appellate attorneys' fees. *See Hunt*, 68 S.W.3d at 136; *Abraxas*, 20 S.W.3d at 763; *Hansen*, 961 S.W.2d at 333–34; *Trien*, 2001 WL 1383115, at *6. We overrule Frisco's second issue.

### 2. District's Attorneys' Fees

In its third issue, the District argues that the evidence at trial conclusively established as a matter of law that its reasonable attorneys' fees totaled the following: $130,000.00 through trial; $15,000.00 on appeal; $7,500.00 for making or responding to a petition for review to the supreme court; and $2,500.00 if a petition for review is granted by the supreme court. It contends that it is entitled to recover its fees under both section 37.009 and 38.001 of the civil practice and remedies code.

The District asserted two counterclaims against The Colony in its first amended answer and original counterclaim, one for breach of contract and one

110

for a declaration that the Contract is valid and enforceable and that The Colony is required to continue making payments to the District. It sought attorneys' fees under civil practice and remedies code sections 37.009 and 38.001. The jury awarded the District $0.00 for its reasonable and necessary attorneys' fees. The District challenged the jury's findings in its motion for judgment notwithstanding the verdict and motion for new trial.

Applying the same standards articulated above relevant to an analysis of section 37.009 attorneys' fees, we address the District's argument that it is entitled to recover attorneys' fees under section 37.009 first. The District states that "the trial court erred" by overruling its motion for judgment notwithstanding the verdict and motion for new trial and that the trial court's decision to not award attorneys' fees is "manifestly unjust." The District thus challenges the trial court's decision to not award attorneys' fees. Liberally construing the District's brief, as we must, the only argument that the District makes that comes close to contending that the award of $0.00 for attorneys' fees is inequitable or unjust is the District's argument that the evidence established that the District was entitled to attorneys' fees as a matter of law. *See* Tex. R. App. P. 38.9. But the award of $0.00 for attorneys' fees is not inequitable or unjust solely because the evidence established that the District was entitled to attorneys' fees as a matter of law (assuming without deciding

that is the case). As with Frisco, the trial court may have concluded that in light of the record, it would not have been equitable or just to award even reasonable and necessary attorneys' fees. *See Bocquet*, 972 S.W.2d at 21. The District sets forth no other argument or evidence that the award of $0.00 for attorneys' fees is inequitable or unjust. Nor is there anything in the record to show that the trial court abused its discretion by not awarding attorneys' fees to the District. Consequently, the District failed to demonstrate that the trial court clearly abused its discretion by not awarding it attorneys' fees pursuant to civil practice and remedies code section 37.009. *See Hunt*, 68 S.W.3d at 136; *Abraxas*, 20 S.W.3d at 763; *Hansen*, 961 S.W.2d at 333–34; *Trien*, 2001 WL 1383115, at \*6. We overrule this part of the District's third issue.

Section 38.001 of the civil practice and remedies code permits the recovery of attorneys' fees if the claim is for an oral or written contract. Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8). To recover attorneys' fees under section 38.001, a party must both prevail on a claim for which attorneys' fees are recoverable and recover damages. *Green Intern., Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997).

Here, as alluded to above, the District asserted a counterclaim for breach of contract and a counterclaim under the UDJA seeking two declarations: (1) "the Contract between the District and The Colony is valid and enforceable" and

112

(2) "The Colony is required to pay the payments to the District for the remaining term of the Contract." The trial court's summary judgment order grants the District summary judgment on all but one of The Colony's causes of action and (only) orders that the Contract is a "valid, unambiguous, enforceable agreement." The order does not specifically state that it was granting the District's motion for summary judgment on its breach of contract counterclaim or the District's request for a declaration that The Colony is in material breach of its obligations to make payments to the District under the Contract. The order provides at its conclusion "that to the extent not specifically granted herein, Defendant NTMWD's First Amended Traditional Motion for Summary Judgment and No-Evidence Motion for Summary Judgment is DENIED."

The final judgment does not award the District any damages for The Colony's breach of the Contract. We hold that the District is not entitled to attorneys' fees under section 38.001. *See Solis*, 951 S.W.2d at 390. We overrule the remainder of the District's third issue.

## VI. CONCLUSION

Having overruled The Colony's three issues, we affirm the trial court's judgment as to The Colony's appeal. Having overruled the District's three issues, we affirm the trial court's judgment as to the District's appeal. Having sustained Frisco's first issue, we render judgment awarding Frisco $642,863.98

113

for The Colony's failure to comply with the Contract; we affirm the remainder of the trial court's judgment.

DIXON W. HOLMAN
JUSTICE

PANEL:  LIVINGSTON, HOLMAN, and GARDNER, JJ.

DELIVERED:  November 26, 2008